**Ernest J. SAVIANO and Margaret Saviano, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 83–2816.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1984.

Decided June 18, 1985.

Harold Ungar, Williams & Connolly, Washington, D.C., for appellants.

Farley Katz, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and CAMPBELL, Senior District Judge.[*]

WILLIAM J. CAMPBELL, Senior District Judge.

"Gold for Tax Dollars," certainly an alluring phrase, is the title of a tax shelter that has enticed thousands of taxpayers with dreams of large deductions. The plan contemplated the taxpayer investing in a gold mine in Panama (for taxable year 1978) or French Guiana (for taxable year 1979) and obtaining thereby a tax deduction equivalent to four times the actual investment. However, the Commissioner of Internal Revenue Service, concluding that the shelter resulted in precious few tax dollars and precious little gold, has disallowed certain of the deductions claimed pursuant to the plan.[1] Appellant,[2] who participated in both the 1978 and 1979 tax shelters, filed this suit challenging the Commissioner's deficiency determinations.

---

[*] The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

[1.] The attorney for the respondent-appellee represented to the Tax Court that the IRS has disallowed approximately $120,000,000 in various taxpayers' deductions resulting from the "Gold for Tax Dollars" tax shelters for the years 1978–1980.

[2.] Margaret Saviano is a party to this litigation only because she signed a joint income tax return with her husband. In the Tax Court and in the briefs filed in this Court the taxpayers have been referred to in the singular. We will continue that usage.

The Tax Court denied Saviano relief as to both years, 80 T.C. 955 (1983), and he filed this appeal under the jurisdiction of 26 U.S.C. § 7482.

Prior to our analysis of the transactions we need to address a preliminary dispute between the parties. For purposes of the cross-motions for summary judgment, the IRS agreed that the Tax Court could assume that the transactions occurred as described in the promotional literature for the tax shelters. The appellant contends that the Commissioner violated this agreement by making certain arguments and that the Tax Court in approving those arguments ignored that agreement.

■■■■ The parties to a lawsuit are free to stipulate to factual matters. However, the parties may not stipulate to the legal conclusions to be reached by the court. For example, in this case it is undisputed that the International Monetary Exchange (IME) and Saviano executed a "Loan Agreement." Appellant then states in his brief, as a fact, that IME loaned him $30,-000 which he then paid for mining expenses. However, neither the nomenclature of the "Loan Agreement" nor the agreement with the Commissioner binds this court as to the appropriate characterization of that transaction for tax purposes. That determination involves a conclusion of law, *see Ortmayer v. Commissioner,* 265 F.2d 848, 854 (7th Cir.1959). Thus, while the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized.

Since the "Gold for Tax Dollars" shelters for 1978 and 1979 were structured differently, they will be described and discussed separately.

### The 1978 Transaction

**Facts.** The 1978 plan provided that the IME would obtain for the taxpayer a mineral lease on certain gold-bearing land from Diversiones Internationales, S.A. (Diver-

siones). The taxpayer determined the volume of land covered by the lease by dividing the amount of the desired tax deduction by 1.60. In this case, Saviano sought a deduction of $40,000. Therefore, he obtained a lease on 25,000 cubic meters of auriferous gravel. IME did not charge the taxpayer any fee for its services in obtaining the lease nor did the taxpayer have to pay anything for the lease itself.[3] Under the lease, Diversiones was to receive 50% of the extracted gold after deduction of the development costs and government taxes. However, the lease did not require that Saviano ever extract any gold. But Diversiones could terminate the lease if Saviano discontinued or abandoned the mining operation. Even in the absence of such action, the lease would terminate in April of 1990 when the gold-mining concession granted to Diversiones by the Panamanian government would expire.

The taxpayer was required to invest one quarter of the amount of the desired tax deduction which was then used to pay mining development expenses. In this case, Saviano paid the $10,000 through IME to Tuquesa Amalgamated, S.A. (Tuquesa) to perform certain development work. Appellant deducted that payment from his income taxes in 1978 as a mining expense under 26 U.S.C. § 616(a). That deduction is not at issue in this appeal.

The controversial aspect of this transaction involves the additional deduction of $30,000 claimed by the taxpayer as a mining expense. That amount was also paid to Tuquesa by IME on Saviano's behalf. However, that money did not come out of appellant's pocket. IME provided the $30,-000 and Saviano claims it is attributable to him by virtue of a "Loan Agreement" between them. That contract provided that the money was lent to appellant on a nonrecourse basis which meant that Saviano was not personally liable for its repayment. The "Loan Agreement" required that the

---

**3.** The mineral lease includes the normal phraseology that the lessor is leasing the property for "one dollar and other valuable consideration." However, the promotional literature does not refer to any such payment and the taxpayer has not suggested that he paid any money for the lease.

$30,000 "be remitted to an approved contractor for development costs" related to Saviano's gold mine. IME's sole security was a general lien on appellant's mineral lease and the only source of repayment would be the proceeds from the gold mine. The "loan" was to bear interest at 10% per annum payable annually. However, any interest unpaid when due was to be treated as a new advance under the loan agreement. In addition to the interest, IME was to receive a 2% commission on the net amount of all gold sales. The loan agreement included a provision that if the accrued advances equaled the estimated market value of the gold, IME was permitted to extract and liquidate sufficient gold to reduce the "indebtedness" to an amount equivalent to 75% of the estimated market value. No other form of self-help was available to IME prior to termination of the agreement.

By claiming the $30,000 payment as his own, Saviano deducted a total of $40,000 as mining expenses on his 1978 income tax return. As a result, he claimed and received a tax refund of $15,865 for that year. However, the Commissioner disallowed the deduction for the mining expense. The taxpayer challenged that determination before the Tax Court. The only issue presented to the Tax Court on the cross-motions for summary judgment was the deductibility of the $30,000 payment which originated from IME. The Tax Court concluded that the liability of the taxpayer under the "Loan Agreement" was too contingent to be treated as a bona fide debt for tax purposes. We agree with that conclusion but utilize a slightly different analysis to reach it.

■ *Legal Analysis.* Appellant contends that the appropriate construction of the 1978 transaction is as follows: IME loaned him $30,000 and he paid that money through IME to Tuquesa as a mining expense. Therefore, he argues that as a cash basis taxpayer he is entitled to deduct the mining expense in the year he paid it rather than in the year that he repays the debt, *see Crain v. Commissioner,* 75 F.2d 962

(8th Cir.1935); *McAdams v. Commissioner,* 198 F.2d 54 (5th Cir.1952). However, as noted previously, the question of whether appellant's arrangement with IME constituted a loan for tax purposes involves a legal conclusion and, therefore, we cannot accept his construction of the transaction without an independent analysis.

Initially, we note a few generalities regarding loans in the context of tax cases. It has been said that "in a true lending transaction, there exists the reasonable likelihood that the lender will be repaid in the light of all reasonably foreseeable risks," *Gibson Products Company v. United States,* 637 F.2d 1041, 1047 (5th Cir.1981). The degree of risk involved in a typical loan is minimized by the lender's reliance on either the value of the personal commitment to repay or adequate security pledged to ensure repayment, *see Brountas v. Commissioner,* 692 F.2d 152, 157 (1st Cir.1982). A capital contribution, on the other hand, is not secured by a promise of repayment but rather is invested at the risk of the business. Normally a capital contributor is entitled to a greater potential return than a lender and that possibility justifies the acceptance of a greater risk.

Nonrecourse loans eliminate the personal commitment of the borrower to repay the debt. In a commercial context such transactions are normally of limited risk because the lender relies on the value of the property securing the debt. As long as the value of the encumbered property exceeds the amount of the liability a reasonable businessman will treat the debt as a personal obligation since, otherwise, he risks losing his equity in the property, *see* Note, Federal Income Tax Treatment of Nonrecourse Debt, 82 Colum.L.Rev. 1498, 1514 (1982). The recent use of nonrecourse loans which are secured by speculative collateral has created a need for close scrutiny of these transactions.

If a financing arrangement is structured under which funds are advanced by an ostensible lender to an operator as ostensible borrower, who is to conduct exploration and development activities on

an unexplored and unproven oil and gas prospect and in which recourse for repayment of the loan is limited to the oil and gas prospect as the burdened property, the transaction may be so lacking in the essential characteristics, economic realities, and financial expectations of a true lending transaction as to call for reclassification of the transaction as one other than a loan and ascribing to it consequences for tax purposes other than those growing out of a true loan. Fielder, "Drilling Funds and Nonrecourse Loans—Some Tax Questions," 24th Southwestern Legal Foundation Institute on Oil and Gas Taxation 527, 528 (1973), quoted in *Gibson Products, supra,* 637 F.2d at 1041.

In *Gibson Products, supra,* and *Brountas, supra,* the courts analyzed those types of nonrecourse loans and concluded that they should not be treated as true loans for tax purposes. Both of those cases involved limited partnership tax shelters which were engaged in oil and gas exploration. The tax shelters were leveraged through the use of nonrecourse loans to the partnerships which were to be repaid solely from the proceeds of the oil and gas wells. The partners deducted from their income taxes as drilling expenses an amount greater than their actual investment because they attributed to themselves their pro rata share of the expenses which were paid through the nonrecourse loan. In both cases the courts concluded that the leveraged portion of the drilling expenses was not a proper deduction for the partners.

In *Brountas* the court analyzed the loan transaction and concluded:

> The obligations here, unlike recourse notes, represented (as a practical matter) a promise to pay only if oil was found. They seem less like the repayment obligation that typically accompanies a recourse loan than like a device for sharing business risks—the risks that accompany oil explorations. 692 F.2d at 158.

The court determined that nonrecourse loans were too contingent to be classified as a liability of the partnership for purposes of 26 U.S.C. § 752. Thus, the taxpayers' deductions were limited to that portion represented by their actual contributions to the partnership.

In *Gibson Products,* the court also analyzed the allocation of risks inherent in the nonrecourse loan transaction. After noting the significant risks assumed by the lender, the court stated:

> The single most important factor dictating our conclusion that the transaction between Galaxy and McNeil/Midwest was not a true loan is the fact that the total combined assets of both joint venturers were not sufficient to pay the note on or before the maturity date, even if McNeil/Midwest was so inclined, absent production from any of the leases. 637 F.2d at 1047.

In that case the terms for the nonrecourse loan permitted the lender at its option to enter into a joint venture with the borrower with regard to any particular producing well and to obtain a 20% participating interest in it. The court noted that this provision deviated from the normal lender/borrower relationship:

> Another characteristic of a true loan is that the "borrower, exclusively, is entitled to all of the entrepreneurial rewards and gains from the application and investment of the loan proceeds and the lender is entitled to none of them as such." *Fielder, supra* at 535.... Here, instead of the borrower (McNeil/Midwest) being exclusively entitled to all of the entrepreneurial rewards and gains from application and investment of the loan proceeds, the lender (Galaxy) was entitled to share in the investment of the loan proceeds along with the borrower. 637 F.2d at 1048.

The court then concluded:

> We, therefore, hold that the transaction between McNeil/Midwest and Galaxy was so lacking in the essential characteristics, economic realities, and financial expectations of a true lending transaction that it must be reclassified for tax purposes as a transaction other than a true loan. 637 F.2d at 1049.

In this case, as in *Gibson Products*, Saviano's gold mining venture has inadequate capital for IME to rely upon for repayment of the debt. The sole security provided under the loan agreement is the mineral lease which has a limited duration and was obtained at no cost. Obviously, unless significant gold-deposits are discovered that asset is worthless. Furthermore, under the loan agreement IME is entitled to a percentage, albeit small,[4] of the net gold sales as a commission. Thus, IME is entitled, as was the "lender" in *Gibson Products*, to share in the entrepreneurial rewards of the venture.

More importantly, the allocation of risk between the parties does not resemble that contemplated by a normal lending transaction. The "loan" is to be repaid solely from the proceeds of the venture which involves numerous significant risks. Surprisingly, the continued operation of the venture, and thus the only hope for repayment, is left solely within the control of the borrower. Therefore, under the "Loan Agreement" IME is assuming the following risks:

(1) That the borrower will choose to pursue the gold-mining venture;[5]

(2) That the borrower will have adequate capital to fund the development of the mine through the extraction phase;

(3) That there is in fact "gold in them thar hills;"[6]

(4) That after the payment of the costs of extraction, government taxes, and lessor payments, there are sufficient proceeds to repay the debt;

(5) That Tuquesa will comply with the terms of its concession with the Panamanian government;[7] and

(6) That Saviano will comply with the terms of his mineral lease.

These are the identical contingencies which must occur in order for Saviano to recover his capital as well as any profit. In fact, IME is actually assuming greater risks than the putative entrepreneur because Saviano has control over the contingencies numbered (1) and (6) above. Therefore, the

---

4. We are not, of course, concerned with the prudence of IME's agreement with the taxpayer. However, we note that in the 1978 transaction IME prepared and distributed the promotional brochures, obtained the mineral lease, and acted as an agent for the taxpayer for absolutely no consideration. The only conceivable benefit to IME is the opportunity to make the nonrecourse loan to the taxpayer.

5. Appellant contends that we must assume that he will pursue the gold mining venture because the appellee agreed in the Tax Court that the parties were "profit-motivated." However, even without further mining, the taxpayer would make a profit on the transaction as described in the promotional literature. In 1978, he invested $10,000 and obtained a tax refund of almost $16,000. At oral argument before this Court, counsel for appellant asserted that if no gold was extracted the taxpayer would have to declare the proceeds of the loan ($30,000) as income in the year the mineral lease expired. Under that scenario, the taxpayer might lose money if the deferral of his income did not produce a profit. However, more importantly, the promotional literature represented that the taxpayer would never have to claim the $30,000 as income. According to the tax opinion letter appended to IME's brochure, if no gold was extracted the proceeds of the loan could be excluded from income pursuant to 26 U.S.C. § 108. (We express no opinion as to the wisdom of that advice.) Thus, the transaction as described in the promotional literature would produce a (tax-free) profit of $6,000 for Saviano in 1978.

6. The deductibility of mining development expenses under 26 U.S.C. § 616 is permitted only when "deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer," Treas.Reg. § 1.616–1(a). This factual predicate is not a guarantee that the mining venture will be profitable or that any gold exists in Saviano's portion of the land. Appellant concedes this contingency in his brief, appellant's br. p. 18. Furthermore, appellant has submitted, as a citation of additional authority, the decision in *Securities and Exchange Commission v. Rogers*, CV 80–4841 MRP (C.D. Cal., March 1, 1985) (hereafter *Rogers* ) which includes certain findings of fact relating to "Gold for Tax Dollars." That court found that the geological reports regarding this mining area had "grossly exaggerated the quality and content of gold present," *Id.* p. 15.

7. The court in *Rogers, supra,* also found that the Panamanian government had cancelled Diversiones' mining concession.

relationship created through the loan agreement involves the sharing of risks and not the allocation of them as is typical of a lending transaction.

Stripped of its technical verbiage, the promotional literature describes the following transaction:

(1) Saviano contributes $10,000 and a mineral lease for 25,000 cubic meters of auriferous gravel is obtained in his name;

(2) IME contributes $30,000;

(3) Saviano's $10,000 and IME's $30,000 is paid to a mining contractor for development expenses;

(4) Saviano agrees that out of the proceeds, if any, of the gold mining venture IME will obtain repayment of its capital contribution as well as its interest and commission prior to his receiving any return of capital and profit.

Thus, the essence of the relationship between Saviano and IME is that of joint investors and not that of a debtor and creditor.

In the Tax Court Saviano argued that the fact that IME had no management control over the gold-mining venture required the conclusion that it was only a lender. Certainly, participation in management is a factor which would weigh in favor of an equity interest, *see, Slappey Drive Industrial Park v. United States*, 561 F.2d 572, 582 (5th Cir.1977). However, as a practical matter that consideration cannot be controlling. A lender to a small corporation may be entitled to certain restrictions on the management of the company which would dwarf the actual control possessed by an individual who owned 100 shares of stock in General Motors Corporation. Furthermore, the Supreme Court has stated:

There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946).

Subsequent to the briefing and oral argument before the Tax Court, but prior to that court's decision, the Supreme Court issued its opinion in *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). The Tax Court stated in a brief footnote that *Tufts* did not conflict with the court's reasoning regarding the 1978 transaction. However, on this appeal, appellant contends that *Tufts* mandates that the nonrecourse loan be treated as a true loan for tax purposes and that, therefore, we must reverse the Tax Court's decision. We conclude that the Tax Court's decision is not inconsistent with *Tufts* and, in fact, that *Tufts* provides significant support for our analysis.

In *Tufts*, the Supreme Court was faced with the issue of whether a taxpayer must include in the amount realized upon the sale of an asset the unpaid balance of a nonrecourse mortgage that exceeded the fair market value of the property. Previously, in *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), the Court had ruled that such a mortgage had to be included in the amount realized when its balance was less than the fair market value of the property. The decision in *Crane* was based on two considerations: that the non-recognition of the mortgage would result in a tax loss without a corresponding economic loss and that, despite its nonrecourse nature, the assumption of the mortgage by the purchaser of the property resulted in an economic benefit to the taxpayer.

In *Tufts*, the Court stated:

*Crane* ultimately does not rest upon its limited theory of economic benefit; instead, we read *Crane* to have approved the Commissioner's decision to treat a nonrecourse mortgage *in this context* as a true loan. [Emphasis supplied.] 103 S.Ct. at 1831.

The Court in *Tufts* concluded that the fact that the unpaid balance of the mortgage exceeded the fair market value of the property did not warrant a departure from the rule stated in *Crane*. But as the language

quoted above indicates, the Court limited its holding, as it had done in *Crane*, to the context of the case presented to it. In fact, the Court indicated that an alternative tax treatment could have been adopted by the IRS:

Although a different approach might have been taken with respect to a non-recourse mortgage loan, the Commissioner has chosen to accord it the same treatment he gives to a recourse mortgage loan. The court approved that choice in *Crane* and the respondents do not challenge it here. The choice and its resultant benefits to the taxpayer are predicated on the assumption that the mortgage will be repaid in full. [Footnote deleted.] 103 S.Ct. 1831–1832.

In the footnote to that passage, the Court stated:

The Commissioner might have adopted the theory, implicit in Crane's contentions, that a non-recourse mortgage is not true debt, but instead, is a form of joint investment by the mortgagor and the mortgagee. On this approach, non-recourse debt would be considered a contingent liability, under which the mortgagor's payments on the debt gradually increase his interest in the property while decreasing that of the mortgagee. 103 S.Ct. 1831 fn. 5.

We conclude that such an approach is appropriate in this case and is not prohibited by the holdings in *Crane* and *Tufts*. Both of those cases involved nonrecourse mortgages secured by substantial collateral. The transactions possessed the classic characteristics of lending agreements and created a situation in which the borrower had a valid business reason to treat the underlying debt as a personal obligation. The Court in *Tufts* stated that the tax analysis it approved was based on the assumption that the mortgage would be repaid in full. That consideration is no different than the principle quoted *supra* p. 646: "[I]n a true lending transaction, there exists the reasonable likelihood that the lender will be repaid in the light of all reasonably foreseeable risks," *Gibson Products, supra* 637 F.2d at 1047.

The transaction involved in the case *sub judice* differs significantly from those in *Crane* and *Tufts*. As discussed previously, the relationship between IME and Saviano is one of sharing risks in the classic manner of joint investors. The assumption that the underlying debt would be repaid in full is tantamount to the assumption that the mining venture will be successful. Therefore, since the nature of the relationship in this case is different from that in *Tufts* and the assumption of full repayment is not warranted, we conclude that the alternative tax treatment for nonrecourse loans suggested in *Tufts* is appropriate.

Our analysis of the 1978 tax shelter is based on the economic substance of the transaction and not on the labels which the parties chose to utilize. As in all tax analysis, "the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship," *Slappey Drive Industrial Park v. United States, supra*, 561 F.2d at 583. The 1978 tax shelter clearly contemplated a joint investment by Saviano and IME in which they both contributed funds and shared the risks of the mining venture. The attempt to superimpose a loan upon the transaction through the use of misleading terminology is obviously a transparent attempt to impute the $30,000 to Saviano so that he may enjoy the desired tax deduction. The appropriate response to such a ruse was uttered many years ago:

Taxes cannot be escaped "by anticipatory arrangements and contracts, however skilfully devised ... by which the fruits are attributed to a different tree from the one on which they grew." *Griffiths v. Helvering*, 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319 (1939) quoting *Lucas v. Earl*, 281 U.S. 111, 115, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930).

Accordingly, we conclude that the Tax Court properly granted summary judgment for the Commissioner as to the 1978 transaction.

### The 1979 Transaction

**Facts.** The "Gold for Tax Dollars" plan had to be revised for the tax year 1979

because 26 U.S.C. § 465 had been amended to eliminate the deductibility of mining expenses funded by nonrecourse loans. However, the legendary tenacity of gold miners was applied to the problem and an alternate means of funding was employed.

In 1979 IME obtained for Saviano, at no charge,[8] a lease from the Paul Isnard mining concession in French Guiana. The size of the mineral lease was determined by the taxpayer by dividing the desired tax deduction by two. Thus, Saviano's lease covered 20,000 cubic meters of auriferous gravel. It had a fixed termination date of August 19, 1986 and also contained a provision authorizing termination if the lessee abandoned or discontinued the mining operation. The lessor was to be paid one dollar for each gram of extracted gold after development and extraction costs and government taxes were paid.

Through IME, appellant paid $8,000 as mining development expenses to General Miniere, S.A., a mining contractor. In order to provide further funding for the venture, IME sold on behalf of Saviano a "gold option" to an unnamed third party. This "gold option" entitled the purchaser to buy the extracted gold at $2.50 per gram.[9] It also provided that the "gold option" was subject to the terms of the lease. A worksheet included with the promotional materials demonstrated how a hypothetical gold-mining venture would be structured. It showed that the amount of gold to be sold through the "gold option" was to be determined by taking the full value of the gold extracted from the leased property and subtracting all the costs, royalties and tax-

es. The resulting value, converted back into grams of gold, determined the amount of gold to be sold to the "gold option" holder.

The proceeds from the sale of the "gold option" and Saviano's $8,000 were paid to General Miniere by IME.[10] Appellant then deducted $40,000 from his income taxes in 1979 as a mining expense under 26 U.S.C. § 616(a). He did not report the $32,000 received for the "gold option" as income in 1979. In that year Saviano applied for and received a tax refund of $15,667. Thereafter, the Commissioner disallowed the appellant's mining development deduction and assessed a deficiency. Saviano challenged the Commissioner's action in the Tax Court and the only issue before that court on the cross-motions for summary judgment was the appropriate tax treatment of the $32,000 paid for the "gold option." The Tax Court determined that the $32,000 should have been reported as income to Saviano in 1979. Appellant challenges that decision in this appeal.

■ **Legal Analysis.** The Tax Court determined that the $32,000 paid to Saviano for the "gold option" was income in the year of receipt. The Court concluded that the contractual right sold to the unnamed third party was not a true option because it did not create an unconditional power of acceptance in the offeree, citing *inter alia, Carter v. Commissioner,* 36 T.C. 128, 130 (1961) and *Koch v. Commissioner,* 67 T.C. 71 (1976). That is, Saviano was not compelled to do, or to forebear from doing, anything under the terms of the "gold option." He could choose not to extract the gold and would be under no obligation to

8. The mineral lease utilized in the 1979 transaction again included language that the consideration for the lease was "$1.00 (U.S.A.) and other valuable consideration." However, *neither the* promotional literature nor the appellant represent that such a payment was made.

9. The promotional literature contemplated that the "gold option" holder would buy the gold at $3.00 per gram. However, on Saviano's "gold option" that figure is scratched out and replaced with $2.50. Saviano also obtained a five-to-one deduction ratio in 1979 instead of the advertised four-to-one ratio.

10. As noted previously, it is not within our purview to comment on the prudence of IME's business dealings, *see* fn. 4, *supra.* However, we note that in the 1979 transaction IME prepared and distributed the promotional brochures, obtained the mineral lease, acted as an agent for the taxpayer, and obtained buyers for the "gold option" (no mean feat considering its terms) *at no charge.* While the litigants intended us to assume that the parties to the transactions are "profit-motivated," *see* fn. 5 *supra,* the facts, as presented, make that assumption difficult.

sell any gold to the unnamed third party. The Tax Court properly analyzed the economic substance of the contract and characterized it as a "conditional preferential right of first refusal." Based on the conclusion that the "gold option" was not a true option and that deferral of the income therefrom was not appropriate, the Tax Court ruled for the Commissioner as to the 1979 transaction, citing, *inter alia, Saunders v. United States*, 450 F.2d 1047 (9th Cir.1971) and *Booker v. Commissioner*, 27 T.C. 932 (1957).

Appellant does not attempt to persuade this Court that the "gold option" is a true option. Instead, he argues that even if it does not fit the classic definition of an option it should be treated as an "open transaction," citing, *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931) and *Virginia Iron, Coal & Coke Company v. Commissioner*, 99 F.2d 919 (4th Cir. 1938), *cert. den.* 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1939). He contends that recognition of the income from the sale of the "gold option" must be deferred because the type and amount of the tax on it can only be determined by future events. Under this rationale, if Saviano chooses not to pursue the mining venture then the $32,000 would be taxed when the "option" lapses; if he does mine the gold and satisfies his obligation under the "gold option" he would be entitled to certain tax adjustments prior to the recognition of any income. For example, appellant claims that upon exercise of the "option" he would be entitled to deduct from the $32,000 the "costs of goods sold." He also suggests in a footnote that the "gold option" contract right should be treated as a capital asset, citing, *Anderson v. United States*, 468 F.Supp. 1085 (D.Minn.1979), *aff'd mem.* 624 F.2d 1109 (8th Cir.1980). We conclude that the appellant is not entitled to treat the sale of the "gold option" as an open transaction and that the contractual right involved is not a capital asset.

The case of *Burnet v. Logan, supra,* involved a taxpayer who sold stock in a steel company for cash and a promise of future payments to be determined by the amount of iron ore extracted from the company's mine. The taxpayer's basis in the stock exceeded the amount of the initial cash payment. The taxpayer did not declare any part of the initial cash payment as income and contended that she would not receive any taxable income until the total amount received by her through the subsequent payments exceeded her basis. The Court in *Logan* upheld the taxpayer's position stating:

> When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. Respondent might never recoup her capital investment from payments only conditionally promised. Prior to 1921, all receipts from the sale of her shares amounted to less than their value on March 1, 1913. She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture. 283 U.S. at 413, 51 S.Ct. at 552.

*Logan* is easily distinguishable from this case. Here, Saviano has no basis in the contract right he sold through the "gold option." He paid nothing for his mineral lease. He deducted all his mining expenses under Section 616 and, therefore, is not entitled to utilize those expenses in computing his basis, *see* Treas.Reg. 1.1016–2(a) (1979). Since Saviano had no basis in the contractual right sold, none of the money received could be treated as return of capital as was the case in *Logan*.

In *Virginia Iron, Coal & Coke Company v. Commissioner, supra,* the corporate taxpayer sold an option to purchase certain mineral rights and land to another corporation. Under the agreement the optionee had to make certain annual payments to maintain the option. In the event the op-

tion was exercised, those payments would have been credited towards the purchase price of the property. Only two payments totaling $425,000 were paid by the optionee. The Court specifically noted that the taxpayer's basis in the property which was the subject of the option exceeded $425,000. After making the two payments the optionee notified the taxpayer that it would not exercise the option. The Taxpayer then filed amended returns for the years in which two payments were received, declaring each payment as income in the year received. The Commissioner, however, contended that the total amount of the payments should be recognized as income in the year the option lapsed. The Court upheld the Commissioner's position stating:

> The principle involved here was discussed by this court in *Bourne v. Commissioner*, 4 Cir., 62 F.2d 648, certiorari denied 290 U.S. 650, 54 S.Ct. 67, 78 L.Ed. 564 [(1933)], where we held that "the question of whether the payment was to be income or not could not be determined until the sale was completed" [page 649] and held the payments made in that case to be taxable income in the year in which the character of the payments was determined. 99 F.2d at 921.

As with *Logan*, this case is distinguishable since the taxpayer had a basis in the subject matter of the transaction. At the time of the cash payments, the possibility existed that the money was simply a return of capital and therefore not recognizable as income. However, in the case *sub judice*, the $32,000 was paid outright and there was no provision for it to be credited toward the purchase price of any property. Thus, there was no uncertainty as to its character in the year of receipt.

Furthermore, contrary to appellant's contention, *Anderson v. United States, supra*, does not support the proposition that the contract right underlying the gold option should be treated as a capital asset. In *Anderson*, the Court applied the principle

that a right of first refusal *can be* a capital asset if the subject matter of that right is a capital asset. In that case the taxpayer sold a right of first refusal to a Holiday Inn franchise in a specific geographical location. The Court concluded that the proceeds from the sale of that right were entitled to capital gains treatment because the subject matter of the contract, i.e., the franchise, was a capital asset, 468 F.Supp. at 1098; *see also, Commissioner v. Ferrer*, 304 F.2d 125 (2nd Cir.1962).

However, the subject matter underlying the "gold option" is not a capital asset. The "gold option" provides that the unnamed optionee could buy at $2.50 per gram any gold that was available after development costs, government taxes, and lessor payments were paid. Thus, what the appellant sold through the "gold option" was a conditional right of first refusal to all the net profits of the gold mining venture.[11] The consideration received by Saviano for that right was an initial cash payment of $32,000 and, if the unnamed third party exercised the right of first refusal, subsequent payments at the rate of $2.50 per gram.

It is settled law that the mining of ore is treated as an income-producing operation and not as a conversion of a capital asset, *Anderson v. Helvering*, 310 U.S. 404, 407–408, 60 S.Ct. 952, 953–954, 84 L.Ed. 1277 (1940) (and cases cited therein). Under those cases the profits from the gold-mining venture would be characterized for tax purposes as ordinary income in the year of receipt by Saviano. Thus, the subject matter of the right of first refusal was not a capital asset but rather involved the entitlement to share in income.

The situation is very similar to that which occurred in *Commissioner v. P.G. Lake*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958):

> The substance of what was assigned was the right to receive future income.

---

11. In his memorandum filed in the Tax Court, the taxpayer provided a similar characterization of the "gold option" contract right, Memorandum of Points and Authorities in Support of Petitioner's Cross-Motion for Partial Summary Judgment, etc. pp. 34–35.

The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property. These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subleties of draftsmanship but by their total effect. [Citations omitted.] 356 U.S. at 266–267, 78 S.Ct. at 695.

Here, as in *P.G. Lake*, the taxpayer has simply converted future income into present income. Therefore, as a cash basis taxpayer, he was required to declare the $32,000 as income in the year of receipt. He was not entitled to treat the sale of the "gold option" as an open transaction because no contingency would alter the character of those funds for tax purposes. The attempt to achieve deferral of income by labelling the contract a "gold option" and creating the possibility of future payments is ineffective. The courts have fashioned a maxim of Confucian simplicity to address such attempts:

> A given result at the end of a straight path is not made a different result because reached by following a devious path. *Griffiths v. Helvering*, 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319 (1939) quoting *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938).

Accordingly, the Tax Court was correct in its ruling as to the 1979 transaction.

### Summary and Conclusion

We note that in our resolution of the tax issues in this case we have not violated the agreement of the parties to treat the transactions as having occurred as they are described in the promotional literature. However, we are compelled to note, as did the Tax Court, that only a fool would actually believe that the transactions did in fact occur as described.[12] The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans.

In the conclusion to its promotional brochures IME quotes, in the interest of enlightenment we are sure, the famous passage of the Honorable Learned Hand:

> Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. [Citations omitted.] *Helvering v. Gregory*, 69 F.2d 809, 810 (2nd Cir.1934).

We have no quarrel with that principle; however, a caveat must be considered in conjunction with it. The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future.

For the reasons stated above, the judgment of the Tax Court is affirmed.

---

**12.** This conclusion is not contradicted by the findings in *Rogers, supra,* which indicate that some mining activity did take place at both mines. The court in that case was not concerned with the financial structure of the taxpayers' investments. In its findings of fact regarding the financial arrangements for the 1978 tax shelter, the court explicitly relied on IME's promotional literature. It appears to have relied on the same documents in describing the 1979 and 1980 transactions.