MONTELEPRE SYSTEMED, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Montelepre Systemed, Inc. v. Commissioner
Docket No. 30290-88
United States Tax Court
T.C. Memo 1991-46; 1991 Tax Ct. Memo LEXIS 65; 61 T.C.M. (CCH) 1782; T.C.M. (RIA) 91046; February 6, 1991, Filed *65 Decision will be entered for the respondent. Paul H. Waldman, for the petitioner. Stevens E. Moore, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 586,389 in petitioner's Federal income tax for its taxable year ending March 31, 1983. The issue for decision is whether a payment received by petitioner from the "sale" of an "option" is taxable as ordinary income or capital gain. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached are incorporated herein by this reference. At the date of filing its petition, Montelepre Systemed, Inc. (hereinafter petitioner), was a Louisiana corporation undergoing liquidation. Its principal place of business was in New Orleans, Louisiana. Petitioner timely filed a return for its taxable year ending March 31, 1983. During all relevant years, Paul Montelepre owned 55 percent of the outstanding common shares of petitioner and was its president. Thian and Company (Thian) was a Louisiana limited partnership formed to construct a 110-bed acute care hospital facility known as Chalmette General *66 Hospital (the hospital). Thian had 18 general partners, including Paul Montelepre, and three limited partners. Thian had four managing partners; and Gerald R. LaNasa, M.D. (Dr. LaNasa), was president of this managing partners' group. Thian's funding consisted of a $ 500 capital contribution by each of the 21 partners (total $ 10,500), and a $ 5,000,000 loan from the Hibernia National Bank. Each of the general partners were jointly and severally liable for the loan; however, it was expected that if the hospital were unsuccessful, the four managing partners and Paul Montelepre would repay a disproportionate amount of the loan. On October 6, 1975, which was sometime after construction of the hospital had begun but before it opened, petitioner's predecessor, Paul Montelepre and Associates, entered into an "Independent Contract" (the contract) with Thian. The contract generally provided that Associates, later petitioner, had sole responsibility for the day-to-day supervision, management, and operation of the hospital for Thian. The contract had a five year term and gave petitioner the right to renew the contract for another five years. Either party could terminate the contract *67 during the first three years for reasons set forth in the contract. Thereafter, either party could terminate without cause upon 120 days prior written notice. However, Thian could not terminate the contract unless all of petitioner's compensation was paid in full. The contract provided that petitioner's compensation would be based on the following: (a) $ 1.25 per occupied bed per day; and (b) 3 percent of gross revenues after the first $ 100,000 per annum of billed charges to patients. Petitioner's fees under (a) would be paid when earned. In contrast, the fees under (b) were to be deferred for one year "in order to allow the hospital adequate time to build a supply of working capital." If the hospital were sold, the contract provided that petitioner's management services would cease unless the buyer wanted to continue employing petitioner. However, the buyer and Thian would be jointly liable for any deferred fees not yet received by petitioner. Also included in the contract was the following provision which is at the heart of the present controversy: In the event [Thian] receives an offer (the "Offer") from any third party to acquire the Hospital or all or substantially *68 all of the assets of [Thian] which offer it desires to accept, [Thian] shall give written notice thereof to [petitioner] setting forth in detail the terms and conditions of the Offer. [Petitioner] shall have the option for sixty (60) days following notice to it of the Offer to purchase the Hospital or assets covered by the Offer upon the terms and conditions set forth therein. If [petitioner] does not exercise its option, [Thian] may sell the Hospital or such assets in accordance with the terms of the Offer.
Both respondent and petitioner have referred to the right contemplated by this provision interchangeably as an "option" or a "right of first refusal." For ease of analysis while setting forth the facts of this case, we term the right an "option." Finally, the contract provided that "This agreement and the rights and obligations of the parties hereunder shall not be assignable." On December 30, 1976, and effective January 1, 1977, Thian assigned its rights in the contract to Chalmette General Hospital, Inc. (Chalmette). Thian still owned the hospital's real estate, while the hospital's equipment and operations were transferred to Chalmette. Chalmette was a shell *69 corporation owned by Thian's 18 general partners and was formed to protect the general partners from personal liability. During the term of the contract, Paul Montelepre made several loans to Chalmette. He borrowed these funds from another corporation not involved herein, where he was the majority shareholder. He then loaned these same amounts to Chalmette in his individual capacity. By letter dated June 29, 1982, Qualicare of Chalmette, Inc. (Qualicare), notified Thian and Chalmette that it was interested in acquiring the hospital for $ 18,000,000, subject to several conditions precedent. The letter also stated that "This proposal should serve as a letter of intent and must be accepted by your principals before we attempt to fulfill the above conditions and release our attorneys to work on the definitive agreements." Qualicare's letter was then attached to a letter dated July 8, 1982, from Thian and Chalmette to petitioner recognizing petitioner's "option" and giving petitioner 60 days from the date of receipt of the letter to buy the assets of Thian and the stock of Chalmette on the terms offered by Qualicare. Qualicare's letter of intent had been agreed to by Dr. LaNasa *70 "subject to the approval of our attorneys and principals of definitive agreements." On July 13, 1982, petitioner responded to the Thian/Chalmette letter and gave several reasons denying that the 60-day period of the contract had yet to begin. Among those reasons, petitioner denied that Qualicare had made a legal offer to purchase the hospital. Petitioner's letter also claimed that a "desire to accept such an offer" as contemplated by the contract had not been made by either Thian or Chalmette because only Dr. LaNasa, as president of the managing partner's group of Thian and as president of Chalmette, had agreed to the terms of Qualicare's letter. Petitioner claimed that he (Dr. LaNasa) was without authority to conclude there was a "desire to accept such an offer" as contemplated by the contract. Thian, Chalmette, and Qualicare agreed with petitioner's interpretation of the law and the contract. There were no further written documents between Thian, Chalmette, and Qualicare until January 26, 1983. On December 21, 1982, petitioner and Qualicare entered into an "Option Purchase Agreement." The prefatory language of the agreement provided that Qualicare was "negotiating to acquire *71 all the stock of Chalmette and all the assets of Thian." The agreement then provided that: [Petitioner] and [Qualicare] agree that in the event [Qualicare] acquires all or substantially all of the issued and outstanding stock or assets of Chalmette and all or substantially all of the assets or partners' interests of [Thian] prior to June 30, 1983, then simultaneously with said acquisition [Qualicare] shall pay [petitioner] One Million Five Hundred Thousand and No/100 Dollars ($ 1,500,000) in cash in consideration of [petitioner] transferring and conveying unto [Qualicare] its purchase option rights under the Contract.
The Option Purchase Agreement also provided that petitioner gave up all management rights it had in the contract and that the contract would be automatically canceled upon Qualicare's acquisition of the hospital and its payment to petitioner of $ 1,500,000 cash. However, this $ 1,500,000 figure did not include any amounts of deferred compensation owed petitioner for its management services. On January 26, 1983, Qualicare entered into an "Agreement to Purchase" with Thian and Chalmette for the purchase of the hospital by Qualicare for $ 18,250,000. *72 The agreement was signed by the partners of Thian and the shareholders of Chalmette and provided for the closing of the sale to take place on or before March 1, 1983. On March 15, 1983, a plan of liquidation was initiated for petitioner. On March 17, 1983, Qualicare purchased the hospital for $ 18,250,000 from Thian and Chalmette, and paid petitioner $ 1,500,000 pursuant to the Option Purchase Agreement. On its return for the taxable year at issue, petitioner treated the "sale" of the "option" as nontaxable to the corporation under section 337. [1] Respondent recharacterized the transaction in his notice of deficiency as follows: It is determined that the $ 1,500,000 paid to you by Qualicare as a management fee is taxable income under section 83 of the Internal Revenue Code. Therefore, your taxable income is increased $ 1,500,000.
*73 The successor to Thian/Chalmette took a deduction for this $ 1,500,000 payment under section 83(h). Respondent denied the deduction. In a suit for refund, the District Court for the Eastern District of Louisiana held that the successor to Thian/Chalmette was entitled to the section 83(h) deduction. Chalmette General Hospital, Inc. v. United States, 1990 U.S. Dist. LEXIS 15629,     F. Supp.    , 90-2 U.S. Tax Cas. (CCH) P50,578 (E.D. La. 1990). OPINION The principal issue that we must decide is whether section 83 applies to the "option" petitioner received in its contract with Thian. If section 83 applies, we must then determine the timing and amount of any income that petitioner must recognize, and how this was affected by the "sale" of the "option" to Qualicare. While we note our general agreement with the District Court holding in Chalmette General Hospital, Inc. v. United States, supra, we point out that our findings of fact and opinion are based solely on the evidence before this Court. We are neither constrained nor expanded by the District Court's holding, and the parties before us are not the same. A. Applicability of Section 83
Generally, section 83 governs the Federal income tax *74 consequences to a service performer when property is transferred in connection with the performance of services by such person. Sec. 83(a); sec. 1.83-1(a)(1), Income Tax Regs. Petitioner does not dispute that there was a "transfer" of the "option" to it by Thian. Rather, petitioner argues under two different theories that section 83 does not apply to this transfer because the "option" was not transferred "in connection with the performance of services." Implicit in one of these theories is the contention that the "option" was not section 83 property. We therefore determine whether the "option" was section 83 property before determining whether it was transferred "in connection with the performance of services." 1. Section 83 Property Our initial determination is whether the contract right transferred to petitioner in this case falls within the realm of section 83. Congressional intent in enacting section 83 "was to equate the tax treatment of restricted stock plans involving employers and employees to the tax treatment accorded other types of deferred compensation arrangements." Centel Communications Co. v. Commissioner, 92 T.C. 612, 628 (1989) *75 (citing H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 254; S. Rept 91-552 (1969), 1969-3 C.B. 423, 500), affd. 920 F.2d 1335 (7th Cir. 1990). It is clear, however, that Congress intended section 83 to apply to all restricted "property," not just stock. Alves v. Commissioner, 734 F.2d 478, 481-482 (9th Cir. 1984), affg. 79 T.C. 864 (1982). In this regard, the Treasury regulations state that the term "property" includes real and personal property other than money or an unfunded and unsecured promise to pay money in the future. Sec. 1.83-3(e), Income Tax Regs.
As noted above, the parties have used the terms "option" and "right of first refusal" interchangeably to refer to the contract right granted to petitioner. They then look to section 83 and the regulations thereunder and analyze those provisions as they pertain to options. Respondent argues that the contract right was an option granted on October 6, 1975, the date petitioner entered into the contract with Thian. Alternatively, respondent argues the date of grant was sometime prior to December 21, 1982, the date petitioner entered into the Option Purchase *76 Agreement with Qualicare. Petitioner apparently also alleges that the contract right was an option with the date of grant being October 6, 1975. However, petitioner argues the option was not the type of property encompassed by section 83. [2] Petitioner cites section 1.83-7(b)(3), Income Tax Regs., which defines "option privilege" for purposes of determining the fair market value of an option, and states that "section 83 applies to benefitting from increases in value during the option period without risking capital." Petitioner states that the option it held was not of this sort; it could not benefit from any increases in value during the option period without risking capital because to exercise its option it would have to pay the same amount that an outside purchaser would pay. We believe the confusion in this case concerning the contract right arises because neither respondent nor petitioner *77 has properly analyzed the property interest involved herein. The contract right was not an option; it was a right of first refusal. Traditionally, a right of first refusal has not been considered an option contract. Anderson v. United States, 468 F. Supp. 1085, 1092 (D. Minn. 1979), affd. without published opinion 624 F.2d 1109 (8th Cir. 1980); 1A Corbin, Contracts, sec. 261 (1963). Option contracts have "two elements: (1) a continuing offer to do something, or to forbear, which does not become a contract until accepted; and (2) an agreement to leave an offer open for a specified or reasonable period of time." Saviano v. Commissioner, 80 T.C. 955, 970 (1983), affd. 765 F.2d 643 (7th Cir. 1985) (citing Koch v. Commissioner, 67 T.C. 71, 82 (1976); Carter v. Commissioner, 36 T.C. 128, 130 (1961); Drake v. Commissioner, 3 T.C. 33, 37 (1944), affd. 765 F.2d 643 (7th Cir. 1985)). With an option, no further action is contemplated by the grantor and the holder is bound "to do nothing but grants him the right to accept or reject the offer *78 in accordance with its terms." 1 S. Williston, Contracts, sec. 61B (1957 ed. & Supp. 1982). On the other hand, when the holder's power to accept is dependent upon some further act of the grantor, the holder has merely a preferential right of first refusal. Saviano v. Commissioner, supra.
Clearly an option was not transferred to petitioner under the contract because petitioner's power to accept was dependent on Thian receiving an offer which it desired to accept. Both parties' arguments that an option was granted to petitioner on the date of the contract with Thian are therefore erroneous. Having determined that the contract granted petitioner a right of first refusal, we must now determine whether this was the same property that petitioner "sold" Qualicare. A right of first refusal has also been called a preemptive right where the holder is given the right to purchase before the grantor makes a contract to sell to another. Anderson v. United States, 468 F. Supp. at 1093; 1A Corbin, Contracts, sec. 261, pp. 472-473 (1963). Under this analysis, at whatever point in time Thian received an offer which it decided to accept, petitioner's *79 right of first refusal "ripened into" an option. Apparently, this is respondent's alternative theory where he argues that the option was granted sometime prior to December 21, 1982. If accepted, this analysis would also fully address petitioner's argument that what it received was not the type of option contemplated by section 83. On the date of grant, the option exercise price would be set at the price offered by Qualicare. Petitioner would then have 60 days to decide whether it wanted to exercise the option. During those 60 days, petitioner could benefit "from increases in value during the option period without risking capital." See sec. 1.83-7(b)(3), Income Tax Regs.
Initially, we find that prior to December 21, 1982, there was no offer made by Qualicare which Thian/Chalmette decided to accept. Dr. LaNasa was unable on his own to bind Thian and Chalmette and there is no evidence that the stockholders of Chalmette and the partners of Thian decided to accept Qualicare's offer prior to Januar 26, 1983. Further, we believe the Option Purchase Agreement dated December 21, 1982, is worded to support a finding that Qualicare and Thian/Chalmette were still in the negotiating stage *80 and that no offer which Thian/Chalmette decided to accept had yet been reached. We find that in the Option Purchase Agreement petitioner agreed to "sell" its right of first refusal. Having made this determination, we need not determine whether petitioner's right of first refusal "ripened into" an option prior to the actual "sale" on March 17, 1983. We base this determination on the fact that the property involved in this case was not merely an option, but also included the rights that petitioner held with its right of first refusal. As shown by petitioner's response to the July 13, 1982, letter of Chalmette/Thian allegedly agreeing to the terms of Qualicare's letter of intent, petitioner could use its preemptive right to force any would-be buyer to expend a great deal of time and energy making an offer which, if accepted, would cause petitioner's right of first refusal to "ripen into" an option. Petitioner could then either purchase the hospital itself or prevent the sale from occurring for 60 days. We believe Qualicare also recognized this fact and that it was partly for this reason that Qualicare paid $ 1,500,000 to get petitioner out of the way. In this regard, Qualicare *81 paid $ 1,500,000 for the right of first refusal, not merely for the value of the "option privilege" as that term is defined in section 1.83-7(b)(3), Income Tax Regs. We therefore find that the property involved in this case, both at transfer and at "sale," was a right of first refusal. We must now decide whether section 83 property includes a right of first refusal. As noted above, section 83 applies to all restricted property transferred in connection with the performance of services. Alves v. Commissioner, supra. A right of first refusal, as a contract right, is property for purposes of property law. The right of first refusal in this case was "restricted" because retaining the right was contingent on the employment agreement remaining in effect. A right of first refusal is not specifically excepted from the types of transfers section 83 encompasses. See sec. 83(e). We have held that section 83 should be given broad application so as to cover transfers not specifically excepted. Alves v. Commissioner, 79 T.C. 864 at 876. While "property" for property law purposes may not necessarily be the same as "property" for tax law purposes, *82 Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 2 L. Ed. 2d 743, 78 S. Ct. 691 (1958), at least one court has treated a right of first refusal as property and held that the "disposition" of that right resulted in capital gain when the subject matter of the contract was a capital asset. Anderson v. United States, supra.We believe that same analysis should apply in this case unless some exception would prevent capital gains treatment. We therefore hold that the right of first refusal in this case, although a capital asset, was subject to section 83 if it was transferred in connection with the performance of services. 2. In Connection with the Performance of Services We must now decide whether the right of first refusal was transferred "in connection with the performance of services." This determination is essentially a question of fact. Centel Communications Co. v. Commissioner, 92 T.C. 612, 627 (1989), affd. 920 F.2d 1335 (7th Cir. 1990). The legislative history to section 83 provides that this section applies to all property which is transferred "by reason of the performance of services." H. Rept. 91-413 (Part 1), *83 1969-3 C.B. 200. Section 1.83-3(f), Income Tax Regs., provides that it applies whenever property is transferred in recognition of the performance of services, whether such transfer is in respect of past, present, or future services. By using the term "in connection with," the plain language of the statute does not require the property to be transferred as "compensation" for the performance of services. Alves v. Commissioner, 734 F.2d at 478; MacNaughton v. United States, 888 F.2d 418, 421 (6th Cir. 1989). Rather, the statute only envisions some sort of relationship between the services performed and the property transferred. Various judicial decisions have fleshed out the required nexus of this relationship. Respondent points out four factors that these decisions have considered: (1) Whether the property right is granted at the time the employee or independent contractor signs his employment contract; (2) whether the property restrictions are linked explicitly to the employee's or independent contractor's tenure with the employing company; (3) whether the consideration furnished by the employee or independent contractor *84 in exchange for the transferred property is services; and (4) the employer's intent in transferring the property. See Centel Communications Co. v. Commissioner, supra; Bagley v. Commissioner, 806 F.2d 169 (8th Cir. 1986), affg. 85 T.C. 663 (1985); and Alves v. Commissioner, supra.
Looking solely to the language of the contract, respondent argues that consideration of these four factors leads to the conclusion that the property was transferred in connection with the performance of services. The right of first refusal was transferred to petitioner at the same time that it signed its employment contract and retention of the right of first refusal was contingent on the contract remaining in effect. Respondent also argues that the contract gives no indication that petitioner provided anything other than its services as consideration for the right, or that Thian intended to transfer the right of first refusal for any reason other than to secure petitioner's services. (a) Evidence Considered Petitioner disagrees with respondent's argument above by claiming that the contract does not reveal *85 the true intent of the parties. Petitioner does not contend that the contract is vague or ambiguous or that it was entered into due to fraud, duress, undue influence, or mistake. Rather, petitioner wants to introduce parol evidence which it claims does not vary the terms of the written instrument; and which it claims is admissible under Louisiana law to show the true intent of the parties, citing Valhi, Inc. v. Zapata Corp, 365 So. 2d 867 (La. Ct. App. 1978). Respondent, on the other hand, contends that we are bound by the rule of Danielson v. Commissioner, 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), to limit our consideration of evidence to the four corners of the contract. Rather than the Danielson rule, we prefer the "strong proof" rule, which provides that when parties to a transaction have specifically set out their agreement in clear terms, strong proof must be adduced by them in order to overcome the declaration. Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957). However, under the doctrine *86 of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we will follow the United States Court of Appeals' decision which is squarely on point when appeal from us would lie in that particular circuit. The Fifth Circuit, to which appeal in this case lies, has applied the Danielson rule but expressly stated it was not determining to what extent the Danielson rule would apply in future cases. Spector v. Commissioner, 641 F.2d 376, 386 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), cert. denied 454 U.S. 868 (1981). We find that we need not address to what extent Danielson would apply in the instant case because the proof offered by petitioner does not even rise to the level of "strong proof" to overcome respondent's determination. The "strong proof" needed by petitioner to overcome the declaration of the contract has at times been called an economic reality test. Rich Hill Insurance Agency, Inc. v. Commissioner, 58 T.C. 610, 616 (1972). Petitioner contends that in reality Thian transferred the right of first refusal to it for providing *87 the hospital's working capital needs and that there were no other written documents, other than the contract, in which the right of refusal could be placed. In this regard, petitioner argues that the working capital needs it supplied included not only the fees that it deferred, but also its majority shareholder's loans to Chalmette and the fact that its majority shareholder, as a partner in Thian, was at risk for the $ 5,000,000 loan from the Hibernia National Bank to Thian. Petitioner then relies on our opinion in Centel Communications Co. v. Commissioner, supra, for its contention that since the right of first refusal was transferred to it for providing the hospital's working capital needs, it does not fall within the ambit of section 83. Before analyzing Centel, we first examine petitioner's claim that its " financing" included Paul Montelepre's partnership interest in Thian and loans to Chalmette. Petitioner has not advanced a theory explaining why Paul Montelepre's personal business transactions should be considered its own other than asking us to find it as a fact. We believe petitioner is arguing that the right of first refusal was *88 given in part to it for its agreement to defer its compensation, and in part to Paul Montelepre for his liability as a partner in Thian and his agreement to make future loans. Thereafter, Paul Montelepre contributed his interest in the right of first refusal to petitioner in something analogous to the step transaction doctrine. None of the evidence presented by petitioner supports a finding that petitioner's financing included Paul Montelepre's personal liability as a partner of Thian. Dr. LaNasa, as a managing partner, testified as follows concerning Thian's intent in making the transfer: Well, the motivation was twofold: Number one, we didn't have the money to open the hospital, and [Paul] Montelepre gave us access to working capital; number two, because of his expertise and his proven ability to run hospitals, we wanted him in service. This was his request to the partnership, and it was granted.
We interpret this statement to reflect the fact that Thian was giving the right of first refusal to petitioner for its services and future working capital. Dr. LaNasa also testified that if Thian did not grant the right of first refusal, "Thian would have to *89 look elsewhere for its financing." It already had Paul Montelepre's financing by way of his liability as a partner in Thian. Petitioner has failed to prove that the right of first refusal was given in part for Paul Montelepre's liability as a partner of Thian. We find that petitioner has likewise failed to prove that Thian transferred the right of first refusal in part for Paul Montelepre's agreement to make future loans to Chalmette. As noted above, Thian intended to transfer the right of first refusal in part for the access that Paul Montelepre gave it to working capital. Petitioner argues this included future loans to be made by Paul Montelepre. Respondent argues that since the loans were made more than one year subsequent to the contract there is no evidence that the parties contemplated these loans. We agree with respondent. The context in which Dr. LaNasa's above statement was given implies he was speaking only of petitioner's deferred fees when he spoke of the access to working capital Paul Montelepre gave Thian. At most, the evidence offered by petitioner shows that Thian transferred the right of first refusal to it for the dual purpose of obtaining petitioner's services *90 and the agreement by petitioner to defer its fees. This evidence does not necessarily conflict with the contract itself. (b) Petitioner's Argument We now examine petitioner's reliance on Centel Communications Co. v. Commissioner, supra.Centel involved a financially struggling corporation which needed its shareholders to provide various personal guarantees, performance guarantees, and subordinations in order to obtain bank loans. The shareholders provided the guarantees voluntarily and without the expectation of consideration or payment from the corporation. Several years later, in recognition of the increased risks the shareholders had assumed under the guarantees and subordinations, the corporation granted to these shareholders options to purchase the corporation's common stock which were exercised two years later. Two of the shareholders in Centel served the corporation in a consulting capacity and one of these shareholders was compensated by the corporation as a consultant. We held that the actions by the shareholders were in their capacity as shareholders and that those actions did not constitute the performance of services. *91 Centel Communications Co. v. Commissioner, supra at 632-633. We therefore held that the options were not transferred in connection with the performance of services. At first glance, the instant case seems to be similar to Centel. Petitioner allegedly received the right of first refusal, at least in part, for providing funds which Thian used for working capital. The fact distinguishing this case from Centel, however, is that there were no apparent facts in Centel that the options were granted for any reason other than the subordinations and guarantees. In addition, there was no employment contract involved. Centel Communications Co. v. Commissioner, supra.
Our facts differ substantially from Centel. The clear language of the contract and Dr. LaNasa's testimony contemplate that the right of first refusal was transferred for services. The right of first refusal was restricted property and it was granted at the same time that petitioner signed its employment contract. Petitioner's argument in this case is essentially the same argument that we addressed in Alves v. Commissioner *92 , supra, where we held that restricted property transferred to an employee at fair market value on the date of transfer was transferred in connection with the performance of services. In Alves, an employer issued restricted stock to an employee in an employment agreement. The employee provided services and paid fair market value for the stock. The employer transferred the property for the dual purpose of obtaining the employee's services and to obtain working capital. Alves v. Commissioner, 79 T.C. at 873. The employee in Alves claimed that by paying fair market value he was an investor and that the stock was therefore not transferred in connection with the performance of services. We stated: the legislative history to section 83 is explicit that where a transfer is made in connection with the performance of services, the statute is to apply in spite of such investment motives. H. Rept. 91-413 (1969), 1969-C.B. 200; S. Rept. 91-522 (1969), 1969-3 C.B. 423, 500-501 * * *. [Alves v. Commissioner, 79 T.C. at 875.]
We need not determine whether petitioner's deferral of its fees made it an investor. *93 Based on the facts and circumstances of this case, we find that petitioner's right of first refusal was transferred to it "in connection with the performance of services" for purposes of section 83 even if it was transferred in part for petitioner's provision of Thian's working capital needs. (c) Petitioner's Alternative Argument As an alternative argument, petitioner argues that section 83 does not apply to the grant of an option to pay the same price for property as an outsider agrees to pay. Petitioner agrees that the transfer of property need not be compensation for section 83 to be applicable. Centel Communications Co. v. Commissioner, supra at 630. It argues, however, that the transfer must be compensatory in nature to meet the legislative history of section 83, citing H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 254; S. Rept. 91-552 (1969), 1969-3 C.B. 423, 500. Petitioner first quotes a portion of section 1.83-3(f), Income Tax Regs., which states: The existence of other persons entitled to buy stock on the same terms and conditions as an employee * * * may, however, indicate that in such *94 circumstances a transfer to the employee is not in recognition of the performance of, or refraining from the performance of, services. * * *
Petitioner then cites section 1.83-7(b)(3), Income Tax Regs., which states that an option privilege, for purposes of determining the fair market value of an option, "is the opportunity to benefit during the option's exercise period from any increase in the value of property subject to the option during such period, without risking any capital." Petitioner argues that when these two sections are read together, section 83 is not applicable when an option requires the holder to pay the same price that an outside purchaser would pay. Petitioner's argument lacks merit in several respects. First, the property involved in this case was the contract right, not the underlying assets and stock of Thian and Chalmette. No other person could obtain a right of first refusal on the same terms and conditions that petitioner did. Second, petitioner seems to be arguing that section 83 does not apply if the price paid for stock equals the stock's fair market value. This is not necessarily the case. Alves v. Commissioner, supra *95 . Third, petitioner "sold" not only its "option privilege," it "sold" its right of first refusal so that even if its argument did have merit it would not apply in this case. We therefore find that respondent did not err in determining that section 83 applied to the transfer of the right of first refusal from Thian to petitioner. B. Timing and Amount of Income We must now determine the timing and amount of income that petitioner must recognize. Generally, when section 83 applies, the service performer must include the fair market value of the property over the amount paid for it at the first time the property is either transferable or not subject to a substantial risk of forfeiture. Sec. 83(a). When a person's rights of full enjoyment in property are conditioned upon future performance of substantial services by it, its rights in such property are subject to a "substantial risk of forfeiture." Sec. 83(c)(1). Likewise, "The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." Sec. 83(c)(2). When property is transferred that is both nontransferable and subject to a substantial *96 risk of forfeiture, the property is considered substantially nonvested. Sec. 1.83-3(b), Income Tax Regs.
At transfer, petitioner's rights in the right of first refusal were substantially nonvested. The right of first refusal was considered subject to a substantial risk of forfeiture because to retain its rights it needed to remain employed by Thian. The right of first refusal was not transferable both because the rights of any transferee would be forfeited had petitioner failed to be employed by Thian, and the contract itself provided it was not transferable. Petitioner was therefore not required to include any amount in income on the transfer of the right of first refusal to it. When substantially nonvested property is subsequently sold or otherwise disposed of at arm's length to a third party while still substantially nonvested, the service performer realizes as compensation the excess of the amount realized for such property over the amount paid for such property. Sec.1.83-1(b)(1), Income Tax Regs. At that time, section 83(a) ceases to apply to the property. Sec. 1.83-1(b)(1), Income Tax Regs.
In petitioner's case, the right of first refusal remained substantially nonvested *97 until the date of disposition. [3] In this regard, petitioner did not actually "sell" the right of first refusal. Qualicare in effect paid petitioner $ 1,500,000 not to exercise its rights. However, we do not find this distinction to be of relevance. We note that the disposition in this case is in effect no different than the disposition that took place in Bagley v. Commissioner, 85 T.C. 663 (1985), affd. 806 F.2d 169 (8th Cir. 1986). In Bagley, we held that a disposition within the meaning of section 83 occurred where an employer paid its employee to terminate his option to purchase stock. Bagley v. Commissioner, 85 T.C. at 673. Petitioner realized $ 1,500,000 in an arm's-length transaction for property for which it paid nothing. The full $ 1,500,000 is compensation under section 83. *98 Based on the foregoing, we find that respondent did not err in recharacterizing the $ 1,500,000 received by petitioner as ordinary income rather than capital gain. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioner's argument is more fully set forth below under section 2, "In Connection with the Performance of Services."↩
3. Arguably, "part" of petitioner's right of first refusal became vested whenever the right of first refusal "ripened into" an option. Acceptance of this argument would not change the outcome in this case because the same taxable year is involved.↩