HOWARD S. AND ANNE F. HOWARD, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Howard v. Commissioner
Docket Nos. 10115-85; 11681-85; 40555-86; 40556-86; 40557-86; 40559-86; 40560-86; 40561-86; 40562-86.
United States Tax Court
T.C. Memo 1988-531; 1988 Tax Ct. Memo LEXIS 560; 56 T.C.M. (CCH) 669; T.C.M. (RIA) 88531; November 15, 1988. *560 Gary Alohawiwoole Altman, and Laurin W. Schutter, for the petitioners. Gregory A. Roth, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) and Rules 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined income tax deficiencies and additions to tax due from petitioners as follows: Income Tax
Additions To Tax
Docket No.
Petitioner
Year
Deficiency
Sec. 6653(a)(1)
10115-85
Howard S. and Anne
F. Howard
1981
$ 31,500.00
$ 1,575.00
* 50 percent of the interest due on
the underpayment of $ 31,500.00
11681-85
Ray Warner, Jr.
1981
$  9,453.00
472.65
* 50 percent of the interest due on
the underpayment of $ 9,453.00
40555-86
Robert (Roger) W. and
Carole Lindner
1981
$ 51,201.00
$ 2,560.05
* 50 percent of the interest due on
the underpayment of $ 51,201.00
Roger W. Franzen
1980
$ 19,354.00
$ 1,157.40
1981
32,587.00
1,841.90
* 50 percent of the interest due on
the underpayment of $ 32,587.00
40556-86
Robert W. and Joan
R. Emmons
1980
$ 27,688.00
$ 1,384.40
Leonard A. and Joan
M. Page
1980
$ 21,867.59
$ 1,093.38
40556-86
Paul A. and Anne
M. Rittenhouse [3]
1981
$ 21,754.62
$ 1,087.73
* 50 percent of the interest due on
the underpayment of $ 21,754.62
Russell M. and
Claudia C. Wicks
1981
$ 90,263.00
$ 4,513.00
* 50 percent of the interest due on
the underpayment of $ 90,263.00.
40557-86
Andrew C. and
1980
$ 50,731.06
$ 2,536.55
Nancy A. Bambeck
1981
24,730.00
1,236.50
* 50 percent of the interest on
the underpayment of $ 24,730.00.
40559-86
Robert E. and
Nancy R. Bradford
1980
$ 21,334.13
$ 1,066.71
40560-86
Edmond C. H. Hyun
1980
$ 25,408.00
$ 1,270.40
40561-86
Martin J. and
Gloria H. Gould
1980
$ 10,675.00
$ 533.75
40562-86
Jerome L. and
Danna B. Grosvenor
1980
$ 82,353.00
$ 4,118.60
*561 Additions To Tax
Docket No.
Sec. 6653(a)(2)
Sec. 6621(c)
Sec. 6651(a)(1)
(Year Asserted)
10115-85 *
1981
--
11681-85 *
1981
--
40555-86 *
1981
--
--
1980
$ 1,706.80 *
1981
3,303.80
40556-86
--
1980
--
--
1980
--
40556-86 *
1981
-- *
1981
--
40557-86
--
1980
-- *
1981
--
40559-86
--
1980
--
40560-86
--
1980
--
40561-86
--
1980
--
40562-86
--
1980
--
The following schedule indicates the residences of the petitioners at the time their respective petitioner herein were filed: Howard S. and Anne
F. Howard
Encino, California
Ray Warner, Jr.
Montrose, California
Robert (Roger) W. and
Carole Lindner
Glendale, California
Roger W. Franzen
Los Angeles, California
Robert W. and
Joan R. Emmons
St. Paul, Minnesota
Leonard A. and
Joan M. Page
Laramie, Wyoming
Paul A. and Anne
M. Rittenhouse
Savannah, Georgia
Russell M. and
Claudia C. Wicks
Colorado Springs, Colorado
Andrew C. and Nancy
A. Bambeck
Cincinnati, Ohio
Robert E. and Nancy
R. Bradford
Danville, California
Edmund C. H. Hyun
Honolulu, Hawaii
Martin J. and
Gloria H. Gould
San Pedro, California
Jerome L. and
Danna B. Grosvenor
Littleton, Colorado
*562 The issues in these consolidated cases [4] and (1) whether petitioners are entitled to deduct certain amounts either as development expenses under section 616 or as exploration expenses under section 617 during the years involved; (2) whether petitioners realized taxable income from the sale of certain options; (3) whether any part of the underpayments here involved were due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a); and (4) whether petitioners are liable for additional interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and they are herein incorporated by this reference. Midas International, Inc., a Nevada corporation, (hereinafter Midas) is currently called MII. Midas was the promoter of the Uranium for Tax Dollars investment program. In 1976 and 1977 Midas acquired by quitclaim deed from *563 one Melvin E. Richards and members of the Richards family certain uranium mining claims known as the Bolivar Claims. Each quitclaim deed reserved the mine value royalty to members of the Richards family. The Bolivar Claims consist of some 714 substantially contiguous unpatented uranium mining claims on the La Jara Mesa approximately 6.5 miles northeast of Grants, New Mexico which is located in the northwest portion of New Mexico. The Bolivar Claims are located on some 10 sections located in the Grants Mineral Belt including Sections 1, 2, 11 and 12 (Township 12 North, Range 9 West) and Sections 25, 26, 27, 34, 35 and 36 (Township 13 North, Range 9 West). A Bolivar claim consists of approximately 20 acres. The holders of the unpatented Bolivar Claims have only a possessory interest subject to the paramount title of the United States. A number of requirements, including performance of annual assessment work, must be met to maintain unpatented mining claims. The holder's rights in an unpatented mining claim may be lost at any time as a result of, among other matters, failure to properly perform annual assessment work on, and failure to file and record proof of performance of such *564 work for the unpatented mining claim. The holder's possessory interest in an unpatented mining claim may be terminated by the United States prior to discovery of valuable mineral. Such interest may also be terminated where failure to comply with the Federal mining laws is discovered by the United States in its examination of an application for a mineral patent. The Bolivar Claims are most closely associated with the Ambrosia Lake district (which also falls within the Grants Mineral Belt). The uranium mineralization in the Ambrosia Lake district is very lenticular, spotty, erratic and non-uniform. There must be closely spaced drilling and sampling of any possible prospect and target area to verify the extent of any ore deposit. Uranium mineralization does not occur in a uniform manner spreading over an extended and wide area such as one section (640 acres or a square mile). In 1980 and 1981 Midas sold mineral claims lease interests in certain of the Bolivar Claims in connection with the Uranium for Tax Dollars program. The 1980 program, as explained in the promotional brochure, featured a 5 to 1 tax deduction based upon the deduction of mining development costs available to the *565 taxpayer under section 616. The taxpayer was expected to provide 20 percent of said deductible development costs, while the remaining 80 percent would come from the sale of an option on the mining claim by the taxpayer. It was further explained in the brochure that pursuant to section 1234 the option sale proceeds were not taxable until the option was exercised or expired. The 1981 program operated in a similar manner except that the taxpayer was to provide 25 percent of the deductible mine development costs, with the remaining 75 percent to be provided by the sale of an option on the mining claim by the taxpayer. The tax advantage under the 1981 program was described in the promotional brochure as a 4 for 1 tax deduction. The 1980 Uranium for Tax Dollars mineral claims lease tracts were situated on portions of Section 1 and all of Section 12 (Township 12 North and Range 9 West) and portions of Section 27 (Township 13 North and Range 9 West). The 1981 Uranium for Tax Dollars mineral claims lease tracts were situated in portions of Section 1 and portions of Sections 27, 34 and 36. With respect to the petitioners in these consolidated cases the relevant leases were in Sections *566 1, 12, 27 and 34. For purposes of the Uranium for Tax Dollars, Midas divided Sections 1 and 12 (Township 12 North, Range 9 West) and Sections 27, 34 and 36 (Township 13 North, Range 9 West) into approximately two-acre tracts. No field survey of the sections, mining claims or tracts was ever made and consequently there existed an overlap of tracts over the actual dimensions of some of the sections. The mineral claims leases state generally that a legal description (Schedule A) of a Uranium for Tax Dollars investor's tract is attached. However, with the exception of petitioner Martin J. Gould, none of the petitioners herein involved received said legal description as part of the executed leases. Moreover, the mineral claims leases lacked metes and bounds property descriptions which would enable an investor to identify the property in which he acquired an interest. Midas did not record any of the mineral claims leases assigned to the Uranium for Tax Dollars investors until September 1982, when Midas recorded in Cibola and McKinley Counties, New Mexico, a Confirmation of Assignment of Undivided Interests which listed certain of the investors and the number of tracts leased by each *567 investor, but not the location of such tracts. In the 1980 and 1981 Uranium for Tax Dollars program, Midas entered into 776 separate mining claims leases with Uranium for Tax Dollars investors under which Midas leased the mineral rights on 1325.5 tracts. A mining claim lease under the Midas programs in 1980 and 1981 involved a tract of approximately two acres. Investors in the Uranium for Tax Dollars program were required to execute the following documents: (1) an authorization of agent; (2) a mineral claims lease; (3) a contractor agreement; and (4) a uranium option. Each of the petitioners herein executed all of the above documents. The authorization of agent document authorized Energy Resource Group (which acted as Midas' sales arm in the 1980 Uranium for Tax Dollars program) to assist the investor in arranging for the sale of a uranium option to acquire all of the investor's right, title and interest in the mineral claims lease, subject to royalty reservation. If a uranium option sale could not be arranged by the agent within seven days, the agent was required to return the investor's check and all documents executed by the investor. The authorization of agent document used *568 in the 1981 Uranium for Tax Dollars program designated Parklane Enterprises (also known as Park Lane Enterprises), as the investor's agent rather than the Energy Reserve Group. Jeffrey Bradpiece is the sole shareholder of Parklane Enterprises. His brother, Sidney Bradpiece, is consultant to Parklane Enterprises. The document authorized the agent "[U]pon sale of 'Uranium Option' and receipt of proceeds, [to] apply said amount together with the attached cashier's check to pay for development as required under the terms of the Mineral Claims Lease Agreement." The document authorized the agent to engage contractors to perform development work on the leases. As initial payment of $ 5,000 for each two-acre tract was required for participation by an investor in the 1980 Uranium for Tax Dollars program. Investors in the program were instructed by Midas to make the initial payments in the 1980 program as well as in the 1981 program to a Midas International Uranium Trust Account. The 1980 mineral claim lease document (indicating Midas as the lessor and the particular investor as lessee) granted to the investor rights to one or more tracts on certain of the Bolivar Claims. The lease term *569 was 15 years. The investor agreed to pay Midas a royalty of 25 percent of all issues, profits or rents, or any other revenues derived from the investor's tract, or from the sale thereof. The mineral claim lease document remained the same under the 1981 program. The 1980 contractor agreement document was executed by the investor as owner and Power Resources, Inc., a New Mexico drilling company, as contractor. Power Resources, Inc. is controlled by members of the Richards family. The contract agreement provided that the contractor would locate and block out the ore body and perform the necessary work to define the ore body preparatory to the sale of the mineral rights in and to real property covered by the agreement. The agreement also provided that Power Resources, Inc. would prepare a complete and detailed plan of the area covered by the mineral claims lease reflecting the location of the ore body, the depth of the ore body and the location of the ore body, the depth of the ore body and the location of the test hole. The contract agreement document remained the same under the 1981 program. There was two different forms of the 1980 uranium option. Under the first option form *570 the Uranium for Tax Dollars investor granted to the option holder an option to acquire all of the right, title and interest in a designated mineral claims lease. The option was for a period of five years. The option provided for consideration to the Uranium for Tax Dollars investor in the amount of $ 20,000 per tract and further provided for an extension of the option for an additional five years for consideration to the investor of $ 10,000 per tract. The option was deemed to be exercised upon completion by the investor (or on his behalf under a contractual arrangement) of certain "preliminary work" described as follows: (1) the blocking out of the ore body on the option area; (2) completion of a report prepared in conformity with generally accepted standards prevailing in the mining industry showing the location and extent of the ore body in the option area; (3) completion of the restoration of the option area to the condition in which it was when the option was granted. The option proceeds paid to the investor were, under the terms of the option, to be used to defray, in whole or in part, the preliminary work. The option also reserved a 50 percent royalty for the Uranium for *571 Tax Dollars investor if he should approve a sale of the claim area to a qualified developer. All of the 1980 Uranium for Tax Dollar petitioners executed the first form of the 1980 Uranium option with the Asian Pacific Trading Corp. designated as the option holder. Sidney Bradpiece is shareholder and trustee of the Asian Pacific Trading Corp. Under the second form of the 1980 uranium option, an "irrevocable option" was granted exercisable on or before November 1, 1985 to acquire all right, title and interest held by the Uranium for Tax Dollars investor in the designated mineral claims lease tract. The uranium option used in the 1981 Uranium for Tax Dollars program was the same as the first option form used in the 1980 program except (1) that the 1981 uranium option provided for consideration to the Uranium for Tax Dollars investor in the amount of $ 15,000 per tract and (2) the option could be extended for an addition five years for consideration to the Uranium for Tax Dollars investor in the amount of $ 7,500 per tract. The 1981 optionholder was the Asian Pacific Trading Corp. Each petitioner concurrently executed the authorization of agent, the mineral claims lease, the contractor *572 agreement and the uranium option documents and then forwarded the four documents, together with the petitioner's Uranium for Tax Dollars investment payment, to the designated agents under the program, i.e., Energy Resource Group in 1980 and Parklane Enterprises in 1981. At the time a petitioner executed his set of documents he did not know the identity of the property in which he was acquiring an interest. Under the "Compensation of Contractor" provision in the contractor agreements executed by petitioners and Power Resources, Inc. it is stated that "simultaneous with the execution of this Agreement" the contractor has been paid both the amount of each petitioner's cash investment as well as the amount attributable to each petitioner's sale of a uranium option. The contractor agreements involving the petitioners who participated in the 1980 Uranium for Tax Dollars program were executed over a period from July 1980 to December 1980. The checks representing the payments by the optionholder to the contractor show dates in the latter part of December 1980. This same pattern was repeated in connection with the 1981 Uranium for Tax Dollars program in that the petitioners who participated *573 in said program executed contract agreements which in some instances preceded the optionholder's checks to the contractor by several months. In 1980 and 1981 the optionholder's checks to the contractor (Power Resources, Inc.) were drawn on the Liechtensteinische Landesbank Vaduz (The National Bank of Liechtenstein). The checks drawn on the bank in Liechtenstein dated December 30, 1980 and payable in varying amounts to petitioners Bambeck, Bradford, Emmons, Gould, Grosvenor and Hyun all show the check number 036867. The checks drawn on the bank in Liechtenstein dated December 30, 1981 or December 31, 1981 and payable in varying amounts to petitioners Bradford, Franzen, Howard, Lindner and Wicks all show the same check number 08702751. The right, title and interest under Uranium for Tax Dollars uranium options have undergone several assignments, including an assignment on October 24, 1980 by the Asian Pacific Trading Corp. to Jerome Saitta, an assignment on July 14, 1981 of Jerome Saitta's interest in the options to A.P.T. Establishment, and an assignment presumably on July 14, 1981 by the A.P.T. Establishment of its interest in the options to Fetrujiks International Establishment. *574 After Midas and the Uranium for Tax Dollars investors entered into the mineral claims leases and uranium options in 1980 and 1981, most of said investors entered into an amended mineral claims lease and an amended uranium lease. The amended documents were mailed to the 1980 and 1981 Uranium for Tax Dollars investors in mid-1982 with a cover letter from Park Lane Enterprises, Inc. The particular cover letter from Park Lane Enterprises, Inc. to petitioner Leonard A. Page under date of May 19, 1982 stated in part as follows: First of all Park Lane took over from Energy Resources Group and is administering the tax shelter program. Since we are involved in the sales of the uranium interests it made sense for us to take over the administration as well. As we have lived with the original documentation used in the 1980 program it has become increasingly clear that the basic agreements are simply not adequate. They contain many ambiguities as to basic provisions. Professionals to whose attention these agreements have been brought have raised many questions about them. Rather than attempt to remedy this situation on a piece-meal basis we have determined, with the help of our own professional *575 staff and outside advisors to remedy this situation. You will find enclosed the Uranium Option Agreement and the Mineral Claims Lease which we feel accurately describes the respective rights and responsibilities of all parties. In order to facilitate the future development of the uranium property and avoid inconvenience to you the new Mineral Claims Lease contains your appointment of Midas International as your attorney in fact to act of your behalf in the event of a sale of the uranium property, or the ore itself, and to enter into any pooling or unitization of these claims and thereby facilitate any prospective sale or development. * * * Will you kindly execute these agreements where indicated by an "x", retain a copy signed by us for your records, and return the one executed by you to us in the enclosed self-addressed stamp envelope. A subsequent letter was mailed by Park Lane Enterprises, Inc. in 1982 to Uranium for Tax Dollars investors. The particular letter from Park Lane Enterprises, Inc. to petitioners Roger W. Lindner and Carole A. Lindner under date of August 20, 1982 stated in part as follows: We recently sent to you an amended Uranium Option and Mineral Claims Lease, *576 and explained the necessity for these documents. To date you have not returned the executed copies to us. It is important that you do this very rapidly. Negotiations are presently in progress concerning a prospective sale of the uranium. It is of great concern that, when all the terms of the sale are agreed upon, the buyer can be given what he is paying for. Recognizing this a substantial majority of the investors have already executed and returned these documents. Because of our obligation to our investors we cannot permit there to be any factor which would delay the consummation of a sale of the uranium and we must inform you that in order to protect your investment it is imperative that you execute the amended documents and return them to us very quickly. Our only recourse, should you not execute them and return them is to stake your claimed area and mine around it. Obviously, should this happen you will not participate in any revenues derived from a sale of the uranium and your investment will have been made for nothing. To insure that you receive this letter we are sending it by certified mail with return receipt requested. To facilitate your executing and returning the *577 required documents we are enclosing copies of them. They are marked with an "X" at the places intended for your signature. In a letter to petitioner Leonard A. Page under date of September 20, 1982 Park Lane Enterprises, Inc. stated in part as follows: If I might I should like to start by giving you a little background and explain the necessity for the proposed amended documentation. We inherited the documentation covering the tax shelter program and toward the end of 1981 the documents were examined by a firm of tax attorneys. They expressed reservations about the documents as they existed and felt that they could be improved to the end that the position of the taxpayer with regards to the taxing authorities could be considerably strengthened. We requested that they proceed and develop documentation which they felt would better serve the purpose. The proposed amendments are those documents. In preparing the amendments it was the position of the tax attorneys that the 8 1/2 percent royalty is a royalty which was reserved by the grantors of Midas. This would be analogous to the landowner's royalty in any conventional minerals deal. The 8 1/2 percent royalty reserved to Midas' *578 grantors was a matter of public record and is referred to in the expression "other royalties" which appears in the earlier documentation. What is left after the payment of this carried interest is a 100 percent working interest. Under the original documentation the optionholder received an option to acquire 100 percent of the interest of the investor. Thereafter the optionholder was required to convey back to the investor a 50 percent interest in and to the royalties. Of this 50 percent interest the investor was, in turn, required to convey 50 percent to Midas. Upon analysis, at the end of these conveyances we find the following: The optionholder has a 50 percent royalty interest; The investor has a 25 percent royalty interest. Under the amended documentation the optionholder acquires an option to receive only 50 percent of the interest purchased by the investor and the investor retains 50 percent. Of the 50 percent royalty interest retained by the investor 50 percent is required to be conveyed to Midas. Thus, we see, at the end of these transactions that the optionholder has a 50 percent royalty interest; the investor has a 25 percent royalty interest and Midas has a 25 percent *579 royalty interest. This, I believe, validates the statement that but for the granting of the Power of Attorney the substance of the transaction has not changed, and it is not intended that it be changed. So far as the request for the Power of Attorney is concerned this came about as a result of negotiations which has taken place with a view to a sale of the uranium property. During these negotiations it became apparent that the property could not be developed on a two-acre by two-acre parcel basis and that inevitably a pooling or unitization would be necessary. In order to protect the investors I am anxious that when negotiations are completed we be in a position to give the purchaser that which he has bought so that we might receive the monetary consideration for the sale of whatever interests are in fact sold, to the end that money can be returned to the investors. Petitioners Howard S. and Anne F. Howard, Roger W. Franzen, and Paul A. and Anne M. Rittenhouse did not execute the amended leases and options; however, all of the remaining petitioners did execute such amended documents. In 1967 Homestake Mining Company and a joint venture in which Homestake Mining Company had an *580 interest conducted exploration activity on the La Jara Mesa, including parts of the Bolivar Claims. From 1967 through 1971 Homestake Mining Company and the joint venture completed a total of 86 exploration holes. Although several thin, high-grade uranium intercepts were found, further drilling produced disappointing results and the exploration activity was discontinued in 1971. In 1978 Midas entered into an option agreement with Gulf Oil Corporation to evaluate and prospect 257 of the Bolivar Claims for Uranium occurrences. The option agreement covered Bolivar Claims comprising 5,140 acres (20 acres per claim) in eight sections: Sections 1 and 11 (Township 12 North, Range 9 West), and Sections 25, 26, 27, 34, 35 and 36 (Township 13 North, Range 9 West). The terms of the option agreement required Gulf Oil Corporation to (1) pay Midas $ 150 for each Bolivar claim (about 20 acres) as a lease bonus or rental payment; (2) pay Midas an additional $ 1,000 for each Bolivar claim to purchase the Bolivar Claims within the ensuing year; (3) develop the property and be in production within five years; (4) pay Midas $ 36,000 annual advance royalty in the event Gulf Oil Corporation exercised *581 its option to purchase; and (5) recover the advance royalty out of a 10 percent production royalty. From 1978 to 1981 Gulf Oil Corporation drilled between 71 and 89 holes comprising 28,797 feet of drilling to evaluate its option claims. During this interim, Gulf Oil Corporation reduced its holdings from 257 claims in eight sections to 179 claims in six sections. Gulf Oil Corporation ultimately decided not to exercise its option on any of the Bolivar Claims after 1980. During the latter part of 1980 Power Resources acted as Midas' agent to secure necessary permits from the Cibola National Forest Service for the various exploration projects. The Midas plan of operation submitted to the Cibola National Forest Service proposed to locate valuable minerals (with uranium as the main objective) through an exploratory drilling venture. A substantial portion of the work deemed necessary involved building access roads, taking care of environmental damage and drilling to ascertain the existence of uranium ores. Power Resources commenced drilling activities in October 1980. As of October 13, 1982 Power Resources had completed a total of 419 holes (including 10 from which core samples were *582 taken) on the Bolivar Claims as follows: Section 1, 108 holes; Section 11, 64 holes; Section 12, 204 holes (including the 10 core holes); Section 27, 43 holes. In addition, some holes were abandoned and some redrilled to deepen the holes. As of August 3, 1983 Power Resources had completed 518 holes (including 11 from which core samples were taken) on the Bolivar claims as follows: Section 1, 115 holes; Section 2, 5 holes; Section 11, 137 holes (including one core hole); Section 12, 216 holes (including 10 core holes); Section 14, 2 holes; Section 27, 43 holes. In addition, some holes were abandoned and some redrilled to deepen the holes. As of November 30, 1984 Power Resources had completed a total of 532 holes (including 11 from which core samples were taken) on the Bolivar Claims as follows: Section 1, 115 holes; Section 2, 5 holes; Section 11, 137 holes (including 1 core hole); Section 12, 230 holes (including 10 core holes and 10 holes drilled by an entity called Homestake Mining Co.); Section 14, 2 holes; and Section 27, 43 holes. No drilling has been done on Sections 34 and 36 and no drilling has been done on Section 27 since March 20, 1981. With the exception of Section 27 *583 tracts leased to 1981 Uranium for Tax Dollars investors on or before March 20, 1981, no drilling has been done on the tracts involved in the 1981 Uranium for Tax Dollars program. Based upon uranium industry average drilling costs in the period here involved as compiled by the United States Department of Energy, the estimated exploration and development drilling costs (including cost of drilling, drill roads, site preparation, geological and other technical support, sampling and drill-hole logging) of Power Resources on Sections 1, 12 and 27 were as follows: Drilling Cost - Using EXPLORATION Cost Per Foot Drilled a *584 Section 1
Sectioon 12
Section 27
Cost
Feet
Drilling
Feet
Drilling
Feet
Drilling
Foot
Drilled
Cost
Drilled
Cost
Drilled
Cost
1980
$ 4.84
8,725
$ 42,229
9.515
$ 46,053
380
$ 1,839
1981
5.19
46,875
243,281
92,755
481,398
14,995
77,824
1982
4.96
27,000
133,920
39,944
198,122
0
0
1983
5.07
0
0
13,258 bb
67,218
0
0
1984
4.66
0
0
7,896 b
40,033
0
0
TOTAL
82,600
$ 419,430
163,368
$ 832,824
15,375
$ 79,663
Drilling Cost - Using EXPLORATION Cost Per Foot Drilled
T-O-T-A-L
Feet
Drilling
Drilled
Cost
1980
18,620
$ 90,121
1981
154,625
802,503
1982
66,944
332,042
1983
13,258
67,218
1984
7,896
40,033
TOTAL
261,343
$ 1,331,917
Drilling Cost - Using DEVELOPMENT Cost Per Foot Drilled
Section 1
Section 12
Section 27
Cost
Feet
Drilling
Feet
Drilling
Feet
Drilling
Foot
Drilled
Cost
Drilled
Cost
Drilled
Cost
1980
$ 3.60
8,725
$ 31,410
9,515
$ 34,254
380
$ 1,368
1981
3.42
46,875
160,313
92,755
317,222
14,995
51,283
1982
6.13
27,000
165,510
39,944
244,857
0
0
1983
3.55
0
0
13,258
47,066
0
0
1984
4.60
0
0
7,896
36,322
0
0
TOTAL
82,600
$ 357,233
163,368
$ 679,721
15,375
$ 52,651
Drilling Cost - Using DEVELOPMENT Cost Per Foot Drilled
T-O-T-A-L
Feet
Drilling
Drilled
Cost
1980
18,620
$ 67,032
1981
154,625
528,818
1982
66,944
410,367
1983
13,258
47,066
1984
7,896
36,322
TOTAL
261,343
$ 1,089,605
Significant uranium mineralization exists on the southwest corner of Section 12 (Township 12 North, Range 9 West) of the Bolivar Claims. This uranium deposit (called the Dena Rich uranium deposit) comprises approximately 0.6 percent of tract acreage involved in the Uranium for Tax Dollars programs. In May 1982 the firm of Chapman, Wood and Griswold, Inc., mining engineers and geologists prepared a report at the request of Power Resources, Inc. on the feasibility of producing uranium ore from the Dena Rich uranium deposits. *585 The report recommended additional surface drilling of 20 holes on Section 12 at a depth of approximately 600 feet and estimated that the drilling cost would be $ 5 per foot. The report refers to all drilling by Power Resources, Inc. as of March 1982 on Sections 1, 2, 11 and 12 as exploratory drillings. The report concluded that, based upon certain assumptions, mining of the Dena Rich uranium deposit would be economically possible at a U308 sale-price of $ 22.50 per pound. The proposed mining plan outlined in the report was based on the assumption that two major conditions would be met: (1) obtaining rights to locate the portal and plant site in the northeast quarter of Section 14; and (2) obtaining access rights across property from State Road 53 to the mine site. The report estimated that production costs as of April 1982 for the Dena Rich uranium deposit would entail capital requirements of $ 4,356,000 for mine entry via Section 14 or $ 6,058,600 for entry via Section 11. Section 14 is not a Bolivar claim. Section 11 is a Bolivar Claims section that is not involved in the Uranium for Tax Dollars program. During the 1960's Section 14 was held by Utah International Lucky Mac *586 which became Pathfinder Mines and is presently held by Cogema (French). Power Resources, Inc. has never obtained access rights to Section 14. On October 4, 1983 Homestake Mining Company formed Wind River Mining Company (Wind River), a New Mexico corporation. Homestake Mining Company was sole stockholder of Wind River. On September 27, 1984 Wind River made an offer to acquire the Uranium for Tax Dollars investors' right, title and interest in the Bolivar Claims. Wind River intended to consolidate all interests in the Bolivar Claims into a single economic unit. This type of consolidation of interests is sometimes referred to as unitization. The terms of the offer were contained in a prospectus dated September 27, 1984 and a prospectus supplement dated October 26, 1984. The Wind River offer was contingent upon acceptance by all Uranium for Tax Dollars investors holding mineral rights in the 1,325.5 tracts leased under the 1980 and 1981 Uranium for Tax Dollars programs. The Wind River prospectus noted (1) that the uranium existing in the Bolivar Claims was not economically recoverable at the then current price of uranium ($ 17.50 per pound of U308 at September 1, 1984) and (2) *587 that uranium prices would have to increase to $ 35 per pound of U308 and that uranium demand would have to increase significantly in order to justify development and mining. The Wind River prospectus supplement indicated that a price of at least $ 27.50 per pound of U308 was required before Wind River would commence a feasibility study for securing entry into the uranium mineralization in the general area of the southwest corner of Section 12 (Township 12 North, Range 9 West). In view of the low demand and market price for uranium, extraction of the mineral was still not commercially feasible as of the date of this trial in January 1987. The prospectus stated that no significant uranium mineralization had been found on the Bolivar Claims involved in the 1981 Uranium for Tax Dollars programs and that a significant uranium mineralization had been found on only a relatively small part of the Bolivar Claims involved in the 1980 Uranium for Tax Dollars program. The Wind River prospectus provided that in exchange for the Uranium for Tax Dollars investor's rights under the mineral claims leases, the investor would receive a nonrecourse loan of $ 1,900 per tract and, in the vent a favorable *588 feasibility study was completed, would receive an additional nonrecourse loan in the amount of $ 514.18 per tract. The Wind River prospectus also stated that the same terms are being offered to every Investor, whether an Investor was a participant in the 1980 or 1981 Tax Program, whether an Investor may be able to establish that he may have an interest in a particular tract or portion of the Bolivar Claims, whether an Investor executed one or more option agreements or an Amended Mineral Claims Lease, and indications of uranium mineralization have been found on or near a particular tract. This transaction was never put into effect. Petitioners herein acquired interests in the following tracts in the Bolivar Claims: Uranium for Tax
Petitioners
Dollars program
Section
Tract
Howard S. and Anne
F. Howard
1981
27
279
Ray Warner, Jr.
1981
1
151
Robert (Roger) W. and
Carole Lindner
1981
1
93, 94, 95
Roger W. Franzen
1980
12
356
1981
27
219, 220
Robert W. and Joan
R. Emmons
1980
12
627
Leonard A. and Joan
M. Page
1980
12
342
Paul A. and Anne M.
Rittenhouse
1981
34
504, 505
Russell M. and Claudia
C. Wicks
1981
27
275, 276
277, 278
Andrew C. and Nancy
A. Bambeck
1980
12
324, 325
326, 327
1981
27
S 1/2, 118
119, 120
Robert E. and Nancy R.
Bradford
1980
1 311
Edmond C. H. Hyun
1980
27
28
Martin J. and Gloria
H. Gould
1980
12
534
Jerome L. and Danna
B. Grosvenor
1980
27
145, 146, 147
When *589 the investors entered into the 1980 and 1981 Uranium for Tax Dollars programs there were no developed ore reserves in the Bolivar Claims. Dr. Maurice E. Morgenstein, petitioners' expert witness, is a mining geologist and sedimentologist. Over the period from about October 30, 1985 through November 3, 1985 he made a field visit to the Bolivar Claims area, specifically to the Yucca Uranium Inc.-Richards Mine. His investigation centered on the exploratory and development activities of Power Resources, Inc. on the Bolivar Claims. The Richards Mine is an open pit mine approximately one acre in extent that was in production during the 1950's. Prior to 1965 some 9,500 tons of uranium ore were mined at the Richards Mine. No uranium ore has been removed from the mine since 1965 and the Richards Mine is not being mined at the present time since the uranium ore is not at present economically marketable. The Richards Mine is located on the southwest corner of Section 11 which is not one of the Bolivar Claims sections involved in the Uranium for Tax Dollars program. The Richards Mine is approximately one mile from the closest Bolivar Claims section (Section 12) involved in the Uranium for *590 Tax Dollars program. The Richards Mine is not part of the Dena Rich uranium deposit. To determine the drilling footage by Power Resources, Inc on the Bolivar Claims, Dr. Morgenstein utilized the figure of 532 holes as the total number of holes drilled by Power Resources, Inc. through November 30, 1984. This total, which represents the number of holes drilled on Sections 1, 2, 11, 12, 14 and 27, includes 10 holes drilled by Homestake Mining Company and 237 holes on Sections 2, 12 and 14 which sections are not involved in the Uranium for Tax Dollars program. Generally, the investment ($ 5,000 or increments thereof) of a Uranium for Tax Dollars investor was deposited by Midas into a Midas Uranium Trust account. Midas then transferred the balances in this trust account to a Power Resources Trust account in a bank at La Crescenta, California. Power Resources, Inc. then transferred an amount ranging from $ 1,300,000 to $ 1,500,000 to a Power Resources, Inc. account in a bank at Milan, New Mexico and the remainder went to other Midas tax programs or entities. The funds placed in the Milan, New Mexico bank account were used for drilling purposes to the extent of $ 800,000, with the balance *591 used to acquire time certificates of deposit. Only a portion of the amount expended for drilling was incurred on Bolivar Claims leased to Uranium for Tax Dollars investors. Power Resources, Inc. never made an accounting to the Uranium for Tax Dollars investors with respect to the cash investments made by the investors. Nor did Power Resources, Inc. made any accounting to the investors with respect to the purported proceeds from the sales of Uranium options by said investors. In a "Decision" dated April 30, 1982 the New Mexico State Office of the United States Bureau of Land Management (BLM) declared the Bolivar Claims 181 through 396 abandoned and void because no proof of labor or notice of intention to hold claims was filed with the BLM by Midas on or before October 22, 1979. The Bolivar Claims 181 through 396 were located on Sections 25, 26, 27, 34, 35 and 36. In a "Decision Amended" the Bureau of Land Management amended the decision of April 30, 1982 to exclude Bolivar Claims 217 through 332 and 353 through 360. In July 1, 1982 Midas appealed the amended decision to the United States Department of Interior, Interior Board of Land Appeals (IBLA). The IBLA held that the Bolivar *592 Claims in question were abandoned. Accordingly, the IBLA held that all of the Bolivar Claims on Sections 25, 26, 27, 34 35 and 36 (Township 13 North, Range 9 West) were abandoned. In July 1982 and January 1983 all of the Bolivar Claims situated on Sections 25, 26, 27, 34 and 35 were relocated by Ronald E. Richards as follows: Bolivar Claim
Section
Date Relocated
181-216
34
7/3/82
217-288
35
1/17/83
289-319
25
1/18/83
321 and 323
325-360
26
7/5/82
361-396
27
7/1/82
In a quitclaim deed dated November 11, 1983, Ronald E. Richards and Linda A. Richards conveyed these relocated claims to Midas. On April 24, 1982, all of the Bolivar Claims situated on Sections 1 and 12 (Township 12 North, Range 9 West) were relocated by Melvin Richards as follows: Bolivar Claim
Section
37 through 72
1
73 through 108
12
In a quitclaim deed dated November 11, 1983, Melvin Richards conveyed these relocated claims to Midas. The relocation of the Bolivar Claims by Ronald E. Richards, Linda A. Richards and Melvin Richards in 1982 and 1983 included all of the tracts involved in the 1980 and 1981 Uranium for Tax Dollars program. Petitioners herein claimed Schedule C deductions designated as mining development expenses for the years in *593 which they participated in the Uranium for Tax Dollars program consisting of the amount $ 5,000 paid by petitioners with respect to the lease of each two-acre tract plus the amount of the purported option price designated in the uranium option document with respect to each two-acre tract. Respondent disallowed these deductions and also determined that petitioners had unreported income with respect to "sale of options" in the year in which they participated in the program. OPINION During the year 1980 and 1981 each of the petitioners, in connection with his participation in the Uranium for Tax Dollars investment program involving the purported development of certain uranium mining claims in New Mexico, claimed deductions for mining development expenses under section 616[5] *594 which were disallowed by respondent. Petitioners have the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
Where a transaction is entered into solely for tax benefits and without any other purpose, the form of the transaction will be disregarded and the tax benefits denied. Gefen v. Commissioner,87 T.C. 1471, 1490 (1986). A transaction will be recognized, however, if it has economic substance. Estate of Thomas v. Commissioner,84 T.C. 412 (1985). In deciding whether a transaction is devoid of economic substance, the taxpayer's subjective statement as to his profit objective in entering a transaction is relevant, but we place greater emphasis on objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner,89 T.C. 986, 992 (1987). In James v. Commissioner,87 T.C. 905, 918 (1986), we outlined the applicable principals: A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious, ( Falsetti v. Commissioner,85 T.C. 332 (1985)), *595 or (2) the transaction is devoid of economic substance consonant with its intended tax effects, ( Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978); Knetsch v. United States,364 U.S. 361, 366 (1960)). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance -- features that have meaningless labels attached." Frank Lyon Co. v. United States,435 U.S. at 583-584; Estate of Thomas v. Commissioner,84 T.C. 412 (1985); Hilton v. Commissioner,74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). Both the taxpayer's subjective business purpose and the transaction's economic substance may be relevant to this inquiry. Collins v. Commissioner,857 F.2d 1383 (9th Cir. 1988). In 1980 and 1981 Midas, the promoter of the Uranium for Tax Dollars program, sold mineral claims lease interests in the so-called Bolivar Claims in New Mexico which were acquired by Midas by quitclaim deed in 1976 and 1977 from members of the family of Melvin E. Richards who *596 had previously located the Bolivar Claims as unpatented lode mining claims. Both programs were offered to investors in package form consisting of four documents: (1) a mineral claims lease, (2) an authorization of agent, (3) a contractor agreement and (4) a uranium option. Payment for the lease was to come from revenues derived from minerals extracted from the investor's tract or from the sale thereof. The 1980 program featured a 5 for 1 tax deduction based upon the deduction of mining development costs available to the investor under section 616. In 1980 the typical investor paid $ 5,000 to participate in the program and then purportedly sold an option to acquire his interest in the lease to the 2-acre tract for $ 20,000 which amount (together with the initial $ 5,000 payment) was claimed by the investor as a mining development cost deductible under section 616. The 1981 program operated in similar fashion except that an investor, after payment of $ 5,000 to participate in the program, purportedly sold an option to acquire his interest in the lease to the 2-acre tract for $ 15,000 which amount (in addition to the $ 5,000) was claimed as a mining development cost deduction under *597 section 616. The 1981 program touted a four for one tax deduction. We conclude on this record that the transactions here involved are utterly devoid of economic substance and must be ignored for Federal income tax purposes. Several factors impel this conclusion. The centerpiece of the Uranium for Tax Dollars programs in 1980 and 1981 is the amount purportedly generated by the sale of the option and then supposedly used to develop the investor's mineral claim. However, we are persuaded on this record that the option sale was purely fictitious and designed solely to created an artificial development cost. Petitioners never saw the uranium options proceeds but simply authorized an agent (supplied by the Midas package) to sell the option to an optionee (supplied by the Midas package) who purportedly paid the option price directly to the contractor (Power Resources, Inc.) selected by the promoters of the program to develop the mineral claim. Power Resources, Inc. was controlled by members of the Richards family. Payment by the optionee (the APT Corporation) to the contractor was supposedly made by check drawn on the Liechtensteinishce Landesbank, Vaduz, described as the National *598 BAnk of Liechtenstein. However, the record shows that the checks drawn on the Liechtenstein Bank dated December 30, 1989 and payable to several of the petitioners herein involved showed the same check number. The same pattern was repeated with respect to checks drawn at the end of 1981. There is no evidence to establish that Power Resources, Inc. ever received the amounts involved. In the 1980 and 1981 Uranium for Tax Dollars programs, Midas entered into 776 separate mining claim leases with investors under which Midas leased mineral rights to 1,325.5 tracts. The initial cash payments by investors in the programs earmarked for development purposes were therefore approximately $ 6,627,500. Additionally, the 1980 investors purportedly realized approximately $ 13,780,000 from the sale of uranium options (approximately 689 sales of options at $ 20,000 per option), while about $ 9,457,500 was supposedly realized in 1981 (approximately 636.5 sales of options at $ 15,000 per option). Thus, Power Resource, Inc. purportedly received a total of some $ 29,995,000 (initial payments by the investors together with the amounts supposedly generated by the option sales) to develop the mining *599 claims. It does not appear on this record that any such amount ever found its way to Power Resources, Inc. The certified public accountant whose services for Power Resources, Inc. included responsibility for the preparation of the income tax returns of the contractor for the years 1979 through 1983, was unable to ascertain that any amount representing the proceeds of the purported option sales (some $ 23,000,000) was ever received by the contractor. Furthermore, the evidence indicates that only a fraction of the initial cash payments by investors was actually expended for drilling by Power Resources, Inc. on the Bolivar mining claims involved in the Uranium for Tax Dollars programs. For example, respondent's expert witness, relying upon figures provided by the United States Department of Energy survey of uranium exploration expenditures which indicated average drilling costs in the industry, determined that the drilling costs incurred by Power Resources, Inc. over the period 1980 through 1984 on sections 1, 12 and 27, which played the dominant role in the 1980 and 1981 Uranium for Tax Dollars programs, were approximately $ 1,330,000. Respondent's expert witness corroborated the *600 industry drilling costs supplied by the government survey by comparing such figures with the drilling costs appearing in a May 1982 technical and economic feasibility study prepared for Power Resources, Inc. by a reputable firm of mining engineers and geologists located in New Mexico with respect to a uranium deposit (the Dena Rich ore body) situated in one section of the Bolivar Claims. The documents involved in promotion of the Uranium for Tax Dollars program in 1980 and 1981 resemble those employed in a strikingly similar tax shelter program put together by International Monetary Exchange (IME) under the sobriquet of Gold for Tax Dollars which was considered by this Court in Saviano v. Commissioner,80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985); see also Smith v. Commissioner,T.C. Memo. 1986-101. In the Saviano case the Tax Court, for summary judgment purposes, assumed that the transactions in 1978 and 1979 occurred as described in the promotional literature. In the 1979 transaction, the taxpayer leased a mineral claim on certain gold-bearing land in French Guiana through its agent IME. The taxpayer paid one-fourth of the desired development expense in cash, financed *601 the balance through the sale of an option and claimed a deduction under section 616(a) in the amount of the cash payment plus the option proceeds. We concluded that the so-called gold option was illusory and not a true option. While the parties in the Saviano case, for purposes of the summary judgment motions, agreed that the transactions in issue were imbued with economic substance we stated: Nonetheless, we feel constrained to note that with or without economic substance the 1979 scheme, like that in 1978 [which involved a nonrecourse obligation rather than an option], both products of a fertile imagination, was carefully designed to avoid current taxation on otherwise taxable income. The sad feature is that their exotic nature has seduced thousands of taxpayers into a minimum investment of $ 2,500 followed at best by years of doubtful litigation. [Saviano v. Commissioner,80 T.C. at 968 n. 17.] In its opinion affirming the Tax Court, the Court of Appeals also voiced its scepticism that the transaction did in fact occur as described, stating that "The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was *602 not being shown all the cards in the deck." Saviano v. Commissioner, 765 F.2d at 654. The record shows that the mineral properties associated with the Bolivar Claims had little more than nominal value at all times here relevant. Respondent's expert witness concluded that there were no developed uranium ore resources on the Bolivar Claims in 1980 and 1981. Based upon his examination of the history of documented exploratory drilling in this area, the expert witness concluded that there was no indication of the existence of ores or minerals in commercially marketable quantities in the sections involved in the Uranium for Tax Dollars programs. His conclusion is supported by a thorough and credible analysis of available materials portraying the location of known uranium deposits in New Mexico. The basic trend of such known deposits, as revealed by survey maps, is unmistakably in a northwest/southeast direction which would negate the existence of any significant mineralization in the region where the Bolivar Claims are situated. We have considered the testimony of petitioners' expert witness, Dr. Morgenstein, who sought to establish the extent of exploratory and development drilling *603 that did in fact take place on the Bolivar Claims. This information was avowedly based on the drilling activities of Power Resources, Inc. and from site geology and hydrogeology which was used by Dr. Morgenstein to decide whether certain drilling was within known trends of ore deposits. Petitioners' second expert witness, Dr. Mifflin, focused upon his interpretation of subsurface configurations in the region in order to establish the overall trend of the prevailing mineral deposits. While Dr. Mifflin's analysis was informative and theoretically plausible, we are unpersuaded by his conclusion which favors a southwest/northeast trend in the location of known uranium deposits in the region. We do not believe that his conclusions, in a large part conjectural, flow necessarily from the type of subsurface information that he relied upon. In short, the information on the location of known uranium mineral ore deposits in this area clearly vitiates the results reached by Dr. Mifflin as to the trends of uranium ore deposits. The conclusions reached by Dr. Morgenstein, based as they are on the information deduced by Dr. Mifflin, are commensurably weakened. Moreover, although Dr. Morgenstein *604 based his conclusions as to the prevalence of exploratory or development drilling on the Bolivar Claims on the activities of Power Resources, Inc., it appears that some of the relevant information was not available from the contractor. For these reasons, we regard as unreliable the testimony and conclusions drawn by Dr. Morgenstein to establish the prevalence of exploratory and development drilling that was performed by Power Resources, Inc. on the Bolivar Claims. The ephemeral nature of the 1980 and 1981 Uranium for Tax Dollars programs is emphasized by the decision made in April 1982 by the United States Bureau of Land Management in New Mexico that certain of the unpatented Bolivar Claims (which included some of the claims in which the investors in the Uranium for Tax Dollars program had an interest) were abandoned and void because no proof of labor or notice of intentions to hold the claims had been filed as required by statute. The decision, as amended by the Bureau of Land Management, was upheld on appeal by the Interior Board of Land Appeals (United States Department of Interior). It also appears from the record that in 1982 and 1983 members of the Richards family relocated *605 Bolivar Claims which included the tracts involved in the 1980 and 1981 Uranium for Tax Dollars programs. It would appear therefore that any interest held by the program investors in these relocated claims were effectively forfeited. The evidence also reveals an effort by Midas some time in 1982 to recast the mineral leases and options in the package of documents originally offered to participants in the 1980 and 1981 Uranium for Tax Dollars programs so as to remedy certain perceived inadequacies in the descriptions of the respective rights and responsibilities of the parties to the transactions. It appears that a major reason for such an effort was to remove possible obstacles in the way of a contemplated sale of the uranium properties. A substantial number of the participants in the Uranium for Tax Dollars programs dutifully executed the amended leases and options. We believe these various factors portray the spurious nature of the 1980 and 1981 transactions. The promotional materials trumpeted the tax advantages of the Uranium for Tax Dollars programs, with no information whatever as to the geological or economic underpinnings of the programs. Petitioners herein demonstrated *606 little or no concern for the economic aspects of their investments and displayed no perceptible awareness of the work, or lack of it, undertaken to develop their mining tracts. Indeed, the evidence shows that there were no developed ore reserves in the Bolivar Claims when the investors entered into the 1980 and 1981 Uranium for Tax Dollars programs. Although Power Resources, Inc. conducted drilling activities on the Bolivar Claims at least through 1984, the record does not establish that such drilling constituted development or exploration of the mining tracts held by investors in the Uranium for Tax Dollars programs. It should be emphasized that members of the Richards family controlled Power Resources, Inc. and also retained rights in the uranium mineral properties here involved. It should also be noted that the evidence in the record indicates that, although the participants in the 1980 and 1981 programs paid approximately $ 6,600,000 ostensibly to develop their tracts, the amount actually expended by Power Resources, Inc., as indicated by the evidence, ranged from $ 800,000 to some $ 1,300,000. Interestingly enough, there is no evidence to show that Power Resources, Inc. ever *607 made any accounting to the Uranium for Tax Dollars investors with respect to either their cash investments or the purported proceeds from the sales of the so-called uranium options. We conclude on the basis of the entire record that the 1980 and 1981 Uranium for Tax Dollars transactions were entered into by petitioners solely for tax benefits and were completely lacking any discernible economic substance. Consequently, the transactions (including those entered into in 1980 and 1981 by the petitioners herein involved) must be disregarded for tax purposes. We therefore hold that petitioners are not entitled to deductions for mining development under section 616 or mining explorations costs under the provisions of section 617. Since we have concluded that the Uranium for Tax Dollars mining ventures were entered into by petitioners solely for the tax benefits involved and without any discernible profit motive, we need not address respondent's alternate arguments for the disallowance of the claimed mining development or exploration expenses. Cf. Thomas v. Commissioner,84 T.C. 1244, 1282 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). In any event, there is no persuasive evidence in *608 the record to show the existence of uranium ore in "commercially marketable quantities" on the Bolivar Claims, a prerequisite to the allowance of mining development expenses under section 616. Moreover, in the absence of any reliable evidence to show that any expenditures incurred were reasonably connected with preparations for extracting ore, the provisions of section 617 (exploration costs) would similarly be inapplicable. See Snyder v. Commissioner,86 T.C. 567, 578 (1986). We further hold, in view of our conclusion that the so-called uranium options are spurious and without effect for tax purposes, that the amounts representing the proceeds from the sale of such options are not includable in petitioners taxable income in the years involved. Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an additional to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the *609 circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners have the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). No useful purpose would be served in discussing separately all of the petitioner-investors here involved. With minor variations, the circumstances under which the petitioners participated in the Uranium for Tax Dollar programs in 1980 and 1981 follow the same general patterns. With the exception of Mr. Bambeck and Mr. Grosvenor, all of the petitioners were college graduates actively pursuing careers in, inter alia, medicine, dentistry, financial planning, insurance and banking. Mr. Bambeck has been a general contractor for some 25 years and Mr. Grosvenor has been a mason constructor for some 20 years. The petitioners, for the most part, displayed a marked indifference to the economic plausibility of the Uranium for Tax Dollars programs upon which they embarked in 1980 and 1981. Most of the petitioners accepted the package offered them, usually on the unquestioned assurances of a financial advisor or a certified public account, without the slightest effort to make a diligent and meaningful inquiry into the economic *610 aspects of the venture. There is no reliable evidence in the record suggesting the exact nature of the advice, if any obtained. They showed scant familiarity with the programs apart from the touted tax benefits. They did not know how the drilling contractor was selected to explore or develop their mining leases and subsequently expressed little or no concern over the existence of any actual drilling on their acquired tracts. Moreover, many of the investors did not know which tract would be assigned them in the Bolivar Claims. We find it inconceivable that any prudent individual would really believe that their agent, chosen by the promoter, could assuredly and routinely sell a uranium option to acquire each and every mining claims lease in the Uranium for Tax Dollars programs within seven days for $ 20,000 (in 1980) or $ 15,000 (in 1981), with the assurance that the investor's check would be returned in the event a uranium option sale could not be arranged. Nor does it appear that any of the investors on the Uranium for Tax Dollars programs questioned the authenticity of a transaction which gave them a drilling expense deduction which included the full amount of their initial payment *611 of $ 5,000 with no allowances whatever for fees or commissions normally paid to the seller of such packaged, tax-advantaged deals. In short, we deem it highly unlikely that any of the petitioners here involved actually believed that the transactions did in fact occur as heralded by the promoters. The commercial surrealism of these transactions should have alerted a reasonable person to the chimerical nature of the uranium mining venture in New Mexico. See Saviano v. Commissioner, 765 F.2d at 654; Collins v. Commissioner, supra.We believe that the entire record clearly establishes negligence on the part of the petitioners here involved so as to warrant the additions to tax under sections 6653(a)(1) and 6653(a)(2)[6] as applicable. Respondent is therefore sustained on this issue. Section 6621(c) (formerly section 6621(d)) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year "attributable to one or more tax motivated *612 transactions." The increased interest rate applies to interest accrued after December 31, 1984 even though the transaction was entered into prior to the enactment of the statute. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent raised the section 6621(c) issue by amended answer with respect to some of the petitioners, see Law v. Commissioner,84 T.C. 985 (1985), and, accordingly, respondent bears the burden of proof in such cases. Rule 142(a), Tax Court Rules of Practice and Procedure.
The term "tax motivated transactions" includes any "sham or fraudulent transaction." Section 6221(c)(3)(A)(v). The statutory language includes transactions, such as the 1980 and 1981 Uranium for Tax Dollars programs, which are fictitious in nature and without economic substance. Cherin v. Commissioner,89 T.C. 986, 1000-1001 (1987). Patin v. Commissioner,88 T.C. 1086, 1129 (1987), affd. sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988). Hence, with respect to the underpayments in each of the cases here involved attributable to the disallowed deductions incurred in connection with the Uranium for Tax Dollars *613 programs in 1980 and 1981, the increased rate of interest applies. Section 6621(c)(1). Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Ray Warner, Jr., docket No. 11681-85; Robert (Roger) W. and Carole Lindner, Roger W. Franzen, docket No. 40555-86; Robert W. and Joan R. Emmons, Leonard A. and Joan M. Page, Paul A. and Anne M. Rittenhouse, Russell M. and Claudia C. Wicks, docket No. 40556-86; Andrew C. and Nancy A. Bambeck, docket No. 40557-86; Robert E. and Nancy R. Bradford, docket No. 40559-86; Edmond C. H. Hyun, docket No. 40560-86; Martin J. and Gloria H. Gould, docket No. 40561-86; Jerome L. and Danna B. Grosvenor, docket No. 40562-86.↩
2. All section references are to the Internal Revenue Code, as amended and in effect during the years at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. With respect to petitioners Paul A. and Anne M. Rittenhouse in docket No. 40556-86, respondent has asserted an increased deficiency for 1981 to reflect (1) the disallowance of a $ 40,000 drilling expense deduction in 1981 rather than $ 25,000 as originally determined and (2) an increase in the amount of income attributable to the sale of an option in 1981. Respondent has the burden of proof with respect to said increase in deficiency, Rule 142(a), Tax Court Rules of Practice and Procedure.↩
4. These consolidated cases were selected as test cases from a large group of cases involving common issues with respect to participation in certain uranium mining transactions. Substantially all of the parties in such cases have agreed to be bound by the outcome of the consolidated cases herein involved.↩
a. Uranium industry average drilling costs per foot (data from U.S. Department of Energy survey of uranium exploration expenditures) b. Estimated↩
5. Section 616 allows a deduction for mining development expenses paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. Section 617 allows a deduction for certain mining exploration expenditures paid or incurred to ascertain the existence, location, extent or quality of any deposit of ore or mineral. Both sections express the intent of Congress to allow the expenditures reasonably connected with preparations for extracting ore. Synder v. Commissioner,86 T.C. 567, 578↩ (1986).
6. In computing the additions to tax under section 6653(a)(2)↩ the parties must recompute the 1981 underpayments to reflect the Court's holding with respect to the income from sales of options issued.